**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 00-20209
_____

PERENCO NIGERIA LIMITED, a Bahamas Corporation,

                              Plaintiff-Counter-Defendant-Appellant,

                         versus

ASHLAND INC.; a Kentucky Corporation,
BLAZER ENERGY CORP.; a Delaware Corporation,
ASHLAND EXPLORATION HOLDINGS, INC.; a Delaware Corporation,
ASHLAND CRUDE MARKETING, INC., a Delaware Corporation,

                              Defendants-Appellees,

                         and

ASHLAND EXPLORATION NIGERIA, INC.; a Delaware Corporation,
ASHLAND NIGERIA DEVELOPMENT COMPANY;
ASHLAND OF NIGERIA LTD., a Delaware Corporation,

                              Defendants-Counter-Claimants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

February 13, 2001

Before HIGGINBOTHAM, WIENER, and DENNIS, Circuit Judges.

WIENER, Circuit Judge:

In this diversity case arising out of its ill-fated attempt to obtain oil exploration and production rights in Nigeria, Plaintiff-Appellant Perenco Nigeria Limited ("Perenco") appeals the district court's grant of summary judgment to Defendants-Appellees and

Defendants-Counter-Claimants-Appellees (collectively, "Ashland") on breach of contract and fraud claims. Finding no reversible error, we affirm.

**I.**

**FACTS AND PROCEEDINGS**

Perenco is the wholly owned subsidiary of a French energy company (Perenco S.A.) which conducts oil exploration and production operations in West Africa. In 1997, Perenco sought to extend its presence to Nigeria and consequently entered into negotiations with Ashland to purchase its Nigerian oil interests.

The subject of the negotiations was the stock of two Ashland subsidiaries, Ashland Oil (Nigeria) Company, Ltd. ("AONC") and Ashland Nigeria Exploration Unlimited ("ANEU"), which were signatories to Production Sharing Contracts ("PSCs") granted by the Nigerian National Petroleum Corporation ("NNPC"). The PSCs gave AONC and ANEU the right to produce oil in Nigeria as "contractors" for the NNPC in return for a share of the profits. The transaction between Ashland and Perenco was structured as a sale of stock in AONC and ANEU rather than as a sale or assignment of the PSCs themselves to avoid the requirement under the PSCs that formal consent to any sale or assignment of the PSCs be obtained from the NNPC prior to the sale.

During negotiations of the Stock Purchase Agreement ("SPA") between Perenco and Ashland, Perenco suggested including a

2

provision that would condition the closing on the "relevant" Nigerian authorities making no objection to the stock sale. Ashland's representatives objected to this provision, however, expressing three grounds: (1) the transaction, as a sale of stock rather than the underlying assets, did not require the approval of the Nigerian authorities (other than the pro forma approval of the Nigerian Securities and Exchange Commission), (2) it would be unwise to include language in the SPA that implied that the Nigerian Minister of Petroleum, Chief Etete ("the Minister"), had approval power with which he was not legally vested, and (3) the Minister in fact had no objection to the sale.[1] In reliance on these representations, Perenco contends, it withdrew its request to include the proposed condition in the SPA.

Unbeknownst to Perenco, however, Roger Benedict, the Managing Director of Ashland's operations in Nigeria, had already informed his superiors that he was "very concerned that if the [stock] sale goes through, [the Minister] will attempt to stop it. He likely has heard that we're for sale from various sources and the message he was sending me yesterday was clear: 'We're going to need the Government's approval.' He may be wrong from a legal standpoint but from a practical standpoint he's correct." Furthermore, after reporting that the Minister had threatened to revoke Ashland's

---

[1]Ashland denies that its representatives orally informed Perenco that the Minister had "no problem" with the sale, but for summary judgment purposes we will assume that the statement was made.

3

PSCs, Benedict advised his superiors that "the best approach is to avoid giving [the Minister] any indication of our position and what the outcome will be, and the next time I see him it is very likely he will be given a 'fait accompli.'" None of this information was shared with Perenco.

Even though the SPA does not include Perenco's suggested condition, it does contain a clause providing for termination of the agreement, <u>inter</u> <u>alia</u>, "at any time by the mutual written agreement of Buyer and Sellers."[2] The SPA also provides that if the agreement were terminated

> by Sellers for any reason <u>except pursuant to an express right to do so set forth herein</u>, Buyer shall be entitled to exercise all rights and remedies available at law or in equity as a result of such wrongful termination; provided <u>in no event shall Buyer ever be entitled to any consequential or speculative damages including, without limitation, lost profits</u>.[3]

Furthermore, the SPA states that each party to the agreement will pay "all legal and other costs and expenses incurred by such party or any of its affiliates in connection with this Agreement[.]"[4] Finally, the SPA contains a standard merger clause whereby Ashland expressly disclaims "all liability or responsibility for any other

---

[2]Article 10.01(d). That article also provides that the agreement "may be terminated . . . (a) by Sellers, if through no fault of Sellers, the Closing does not occur on or before July 31, 1997; [or] (b) by Buyer, if through no fault of Buyer, the Closing does not occur on or before July 31, 1997."

[3]Article 10.02(a) (emphasis added). The SPA specified that this provision survives termination of the agreement.

[4]Article 12.03.

representation, warranty, statement or information made or communicated (orally or in writing) to Buyer" except of course "to the extent expressly set forth" in the SPA.[5]

The SPA was executed by the parties in Houston on June 6, 1997.  In it, Perenco contracted to purchase the stock of AONC and ANEU for $60 million (subject to adjustments).  Pursuant to the SPA, Perenco tendered a deposit of $1 million.  Perenco now asserts that, among the representations and warranties made by Ashland in the SPA, the following were known by Ashland to be false when it executed the SPA, in light of Ashland's knowledge of the Minister's position on any such sale:

- "The Shares are . . . free and clear of all . . . encumbrances of any kind and are not subject to any agreements or understandings . . . with respect to the voting or transfer thereof."[6]

- "Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated herein will . . . conflict with or result in a breach, default or violation of, any material agreement, document, instrument, judgment, decree, order, governmental permit, certificate or license to which Sellers or any International Company is a party or is a subject which would have a Material Adverse Effect[.]"[7]

- "To the knowledge of the Sellers . . . no consents are required to be obtained by Sellers or any International Company for the transfer of the

---

[5]Article 11.05.

[6]Article 4.03.

[7]Article 4.04.

5

Shares to Buyer."[8]

The SPA specified a closing date of July 1, 1997.

Soon after the execution of the SPA, two Perenco representatives, P.C. Spink and Denis Bizeau, traveled to Nigeria to inspect the Ashland properties. Article 9.08 of the SPA provides that

> [a]s soon as practical following the execution of this Agreement, Sellers and Buyer will advise the appropriate Governmental Authorities in Nigeria of the change in control of AONC and ANEU. Sellers, at Buyer's request, will arrange meetings with the Nigerian Authorities and will accompany and introduce Buyer.

Accordingly, Roger Benedict set up a meeting with the Minister that was to take place on June 11, 1997. When Benedict and the Perenco representatives arrived, however, the Minister did not meet with them, and the meeting was rescheduled for the next day.

Around 10:30 p.m. that evening, though, at the urging of their Nigerian "consultant," Major General Bajowa, the Perenco representatives (without Benedict's knowledge) met with the Minister at his home. At that meeting, when the Perenco representatives announced that they had "bought Ashland's crude reserves," the Minister announced that Ashland was doing "what I have told them not to do" and threatened to detain Benedict. On June 13, 1997, the Minister issued a statement that purported to terminate Ashland's PSCs.

According to Perenco, it did not become aware of the problems

---

[8]Article 4.19.

that Ashland was having with the Minister until June 12, 1997, when "Perenco for the first time came to understand that the Minister had told Ashland that his consent was necessary." Perenco also received a copy of a letter to Ashland from the Office of the Minister on or about July 10, 1997, detailing matters that Perenco now characterizes as fraud, such as statements that the Minister had twice invited Ashland to his office, and twice Ashland had undertaken some action that the Minister characterized as dishonest. Likewise, Roland Fox, the President of Perenco, testified in his deposition that Perenco had knowledge of Ashland's alleged deception of the Minister during the month-long period that followed, during which unsuccessful efforts were made by Perenco, Ashland, the United States Department of State, the White House, and members of the United States Congress to reverse the Minister's position on Ashland's PSCs.[9]

In light of these events, on July 11, 1997, representatives of Ashland and Perenco discussed the SPA and agreed that it should be terminated. On July 16, 1997, Ashland wrote a letter to Roland Fox stating that

> the Minister of Petroleum has informed Ashland that the termination of the [PSCs], which constitute owned assets of the international companies is final and irrevocable. As a result, Ashland will be unable to complete the transaction contemplated in the [SPA] . . . and the Principals have agreed on the terms and conditions of

---

[9]Ultimately, Ashland was permitted to sell its rights (at a considerable loss) to a company of the Minister's choosing for compensation in an amount determined by that company and the NNPC.

> such termination.
>
> Within three (3) business days after receipt of an executed copy of this Letter of Termination, Ashland will refund the Deposit in immediately available funds. <u>This termination is without prejudice to any rights or remedies that may otherwise be available to the parties.</u>[10]

Fox immediately wrote back, suggesting revisions to the letter, and a revised draft, which included Fox's suggested changes, was sent back to him.[11] Fox then signed and returned that letter to Ashland on July 22, 1997, and shortly thereafter Ashland returned Perenco's $1 million deposit. Accordingly, the SPA was terminated pursuant to an express right to do so — by the mutual agreement of the parties — as provided by Article 10.01(d).

Perenco filed this suit in 1998, alleging four causes of action: breach of contract, statutory fraud, common-law fraud, and negligent misrepresentation. With respect to each cause of action, Perenco claims $300 million in damages for loss of the benefit of its bargain and $100 million for loss of reputation.[12] In 1999, the

---

[10]Emphasis added.

[11]Fox suggested that the phrase "the Principals have agreed on the terms and conditions of such termination" be changed to read "the agreement is therefore terminated."

[12]Ashland's counterclaims against Perenco for breach of contract and negligent misrepresentation were dismissed without prejudice by the district court when it rendered final judgment. Ashland alleged that Perenco (1) breached the SPA by contacting the Minister directly and "conducting [itself] in an undiplomatic and discourteous manner," and (2) negligently misrepresented the nature of the transaction to the Minister causing the loss of Ashland's PSCs.

district court granted summary judgment to Ashland, reasoning that Perenco had elected the remedy of rescission by entering into the termination agreement with Ashland and accordingly was precluded from seeking the remedy of damages. The district court also ruled that the alleged misrepresentations were not false, that they were not representations of fact, and that in any case Perenco had not relied on the representations to its detriment. The district court entered final judgment, after which Perenco timely filed a notice of appeal.

## II.

### ANALYSIS

A. <u>Standard of Review</u>

We review a grant of summary judgment <u>de novo</u>, applying the same standard as the district court.[13] A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact.[14] An issue is material if its resolution could affect the outcome of the action.[15] In deciding whether a fact issue has been created, we must view the facts and the inferences to be drawn therefrom in the light most favorable to the

---

[13]<u>Morris v. Covan World Wide Moving, Inc.</u>, 144 F.3d 377, 380 (5th Cir. 1998).

[14]Fed.R.Civ.P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

[15]<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

nonmoving party.[16]

The standard for summary judgment mirrors that for judgment as a matter of law.[17] Thus, the court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence.[18] In reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party as well as that evidence supporting the moving party that is uncontradicted and unimpeached.[19]

B. Breach of Contract

As an initial matter, we note that both parties to this complex, arms-length transaction are sophisticated, well-represented corporations which had had extensive prior experience with the vagaries of oil exploration and production in Africa.[20] Although both parties agree that Ashland was not legally required under either Nigerian law or the terms of the PSCs to obtain the

---

[16]See Olabisiomotosho v. City of Houston, 185 F.3d 521, 525 (5th Cir. 1999).

[17]Celotex Corp., 477 U.S. at 323.

[18]Reeves v. Sanderson Plumbing Products, Inc., 533 U.S.---, 120 S.Ct. 2097, 2102 (2000).

[19]Id. at 2110.

[20]In fact, Denis Bizeau, one of the Perenco representatives who traveled to Nigeria after the SPA was executed, stated in his deposition testimony that "[o]ne of the reasons [for the trip to Nigeria] was . . . to visit with the Minister, say hello, and introduce Perenco, reintroduce Perenco to him, because he knew us already. And his team knew us even much better."

Minister's consent to the stock transaction contemplated in the SPA, the record evidence fully supports the view that both parties well understood that, as a practical matter, the transaction needed the blessing of the Nigerian government to be successful. Even Perenco admits that Ashland's alleged misrepresentation that the Minister "had no problem" with the sale indicated only that the Minister had no objection "in principle" to the sale and was not misleading with respect to any objections that the Minister might have had to Perenco itself as the buyer. In short, sophisticated and experienced parties, supported by platoons of lawyers, consultants, and advisers, cannot simply shut their eyes when entering into a complex, multi-million-dollar transaction in a volatile venue, then claim to have been deceived or misled when the deal later heads south.

Admire as we might Perenco's creativity in devising its breach-of-contract theory of liability, it is nevertheless apparent to us that Perenco's so-called "breach of contract" claims are essentially fraud claims in a different guise. The core allegations that Perenco relies on as the basis of its breach-of-contract claims are precisely the same as those that comprise the basis of its fraud claims, i.e., that Ashland falsely represented to Perenco that the Minister had "no problem" with the transaction. But alleged misrepresentations that pre-date the very existence of a contract cannot constitute a breach of that contract.

11

Neither can Perenco can show any damages recoverable on a breach-of-contract theory of liability. Perenco is entitled only to such damages as would place it in the position that it would have occupied had Ashland not breached the contract;[21] however, under Texas law, Perenco cannot recover damages for loss of business reputation in a breach-of-contract action.[22] Accordingly, had Ashland disclosed the relevant information, Perenco could either have refused to contract or reserved the right to terminate in the event of interference by the Minister. Under either hypothetical alternative, Perenco would be in exactly the same position in which it now finds itself.[23] It follows then that, as Perenco cannot show that Ashland's alleged misrepresentation deprived Perenco of any benefit of its bargain, its breach-of-contract claim must fail.

C. Tort

Perenco also asserts tort claims of common-law fraud, statutory fraud in the sale of stock, and negligent

---

[21]See Stewart v. Basey, 245 S.W.2d 484, 486 (1952).

[22]See Hollywood Fantasy Corp. v. Gabor, 151 F.3d 203, 214 (5th Cir. 1998).

[23]Perenco's unsupported belief that it somehow could have secured the benefit of its bargain had it only known of the Minister's intentions is too speculative to support an award of damages. Cf. Richter, S.A. v. Bank of America Nat. Trust and Sav. Ass'n, 939 F.2d 1176, 1188 (5th Cir. 1991) (concluding that plaintiff's belief that he could have sold his interest in a winery for $1.6 million was insufficient evidence of damages because there was no proof of an offer to purchase).

12

misrepresentation. Although we agree with the district court that Perenco's fraud claims cannot survive Ashland's motion for summary judgment, we reach that conclusion via a somewhat different route.

Under Texas law, a plaintiff alleging fraud must establish (1) a material misrepresentation, (2) which was false, and (3) which was either known to be false when made or was asserted without knowledge of its truth, (4) which was intended to be acted upon, (5) which was relied upon, and (6) which caused injury.[24] The absence of proof of any element, of course, will prevent recovery.[25] The elements of statutory fraud in the sale of stock are substantially the same, except that to recover actual damages, a plaintiff does not have to prove that the defendant knew a statement was false.[26] Similarly, the primary difference between a cause of action for negligent misrepresentation and one for fraud is that a negligent misrepresentation claim does not require an actual intent to defraud, only that in doing so the party making the false statement acted negligently in doing so.[27] All three tort causes of action asserted by Perenco — common-law fraud, statutory

---

[24]See Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc., 960 S.W.2d 41, 47 (Tex. 1998).

[25]Custom Leasing, Inc. v. Texas Bank & Trust Co. of Dallas, 516 S.W.2d 138, 143 (Tex. 1974).

[26]Swanson v. Schlumberger Technology Corp.,895 S.W.2d 719, 732 (Tex. App. — Texarkana 1995), rev'd on other grounds, 949 S.W.2d 171 (Tex. 1997).

[27]Federal Land Bank Ass'n of Tyler v. Sloane, 825 S.W.2d 439, 442 (Tex. 1991).

13

fraud in the sale of stock, and negligent misrepresentation ——
require a showing of both reliance and damages.

The district court found that no misrepresentation had been made by Ashland, which had only expressed "its legal opinion that the Minister's approval was not required." That conclusion by the court, however, reflects a misconception of the nature of Perenco's claims. The misrepresentation of which Perenco complains is not that the Minister's approval was legally required, but rather that the Minister, in fact, had "no problems with" this particular stock sale and would not interfere.[28] The summary judgment record contains ample evidence to support Perenco's contention that, at the time Ashland allegedly represented that the Minister "had no problems with" the sale, Ashland knew to the contrary that the Minister was threatening to block any sale of Ashland stock.

But the summary judgment record also contains ample evidence supporting the district court's conclusion that when Perenco agreed to terminate the SPA, despite its knowledge at that time of Ashland's alleged mendacity, Perenco nevertheless knowingly elected the remedy of rescission and thereby waived its right to bring

---

[28]For this reason, we reject Ashland's invitation to apply the Act of State doctrine, whereby United States courts will not pass judgment on the validity of the public acts of foreign sovereigns within their own territory. See Callejo v. Bancomer, S.A., 764 F.2d 1101 (5th Cir. 1985). Ashland's alleged misrepresentation turns on its own knowledge of the Minister's position on the sale prior to the signing of the SPA, and not on the legality or "validity" of the Minister's subsequent actions with respect to blocking the sale, much less the legal technicality of his authority to approve or disapprove of the transaction.

14

these claims for damages. Under well-established principles of Texas law, when a party discovers fraudulent inducement in the making of a contract, that party must choose within a reasonable time either to (1) stand to the bargain and seek damages for fraud, or (2) rescind the contract.[29] Perenco's claim that it only discovered the full extent of Ashland's duplicity after signing the termination agreement is flatly contradicted by its own admission that on June 12, 1997 (twenty days before the signing of the termination agreement) "Perenco for the first time came to understand that the Minister had told Ashland that his consent was necessary."[30] Likewise, Perenco received a copy of a letter from the Office of the Minister on or about July 10, 1997, detailing the same matters that Perenco now characterizes as fraud, such as statements by the Minister that he had twice invited Ashland to his office, and twice Ashland had undertaken some action that the Minister characterized as dishonest. Even Perenco's president testified in his deposition that Perenco acquired knowledge of Ashland's alleged deception of the Minister over the course of the month-long period that unsuccessful efforts were made to reverse the Minister's position on Ashland's PSCs. In light of this uncontroverted evidence, we cannot but conclude that Perenco waived its right to bring a claim for damages when it knowingly and

---

[29]L&B Oil Co., Inc. v. Arnold, 620 S.W.2d 191, 193 (Tex. App. —— Waco 1981, writ dismissed).

[30]Emphasis added.

15

willingly rescinded its agreement with Ashland.

Perenco nevertheless seeks to avoid this result by claiming that the "without prejudice" clause of the termination agreement permits Perenco to terminate the contract <u>and</u> sue for damages. This contention is meritless: Perenco's reading of the "without prejudice" clause completely disregards the termination agreement's express reservation of <u>only</u> those "rights and remedies that may <u>otherwise</u> be available to the parties."[31]  Because, as Perenco quite correctly maintains, we must give effect to <u>all</u> the provisions of the termination agreement,[32] then we must also reject Perenco's attempt to read "otherwise available" out of the termination agreement.[33]  Furthermore, as a contract must be interpreted to validate the intent of the parties,[34] Perenco's expansive reading of the "without prejudice" clause flies in the face of the SPA's termination provisions which specifically prohibit suits for lost

---

[31]Emphasis added.

[32]<u>See</u> <u>R&P Enterprises v. LaGuarta, Gaveral & Kirk, Inc.</u>, 596 S.W.2d 517, 519 (Tex. 1980).

[33]Accordingly, as we do not find the language of the termination clause ambiguous, we need not reach Perenco's claim that the district court abused its discretion in denying Perenco's motion to supplement the record with parole evidence consisting of the deposition testimony of the clause's drafter, which testimony Perenco chose not to tender in response to Ashland's summary judgment motion.

[34]<u>Harris v. Rowe</u>, 593 S.W.2d 303, 306 (Tex. 1979).

profits[35] or even out-of-pocket expenses.[36]  Accordingly, we agree with the district court that having already made a knowing election to rescind the contract and restore the status quo ante (including Perenco's recovery of its $1 million deposit), Perenco cannot now seek a "double" recovery of damages.

## III.

## CONCLUSION

For the reasons explained above, the district court's grant of summary judgment is

AFFIRMED.

---

[35]Section 10.02.

[36]Section 12.03.

17