**PROSPECT HIGH INCOME FUND, ML CBO IV (Cayman), Ltd., Pamco Cayman, Ltd., Pam Capital Funding, L.P., Highland Crusader Fund, Ltd., and PCMG Trading Partners VII, L.P., Appellants**

v.

**GRANT THORNTON, LLP, Appellee.**

No. 05–05–00092–CV.

Court of Appeals of Texas, Dallas.

Oct. 18, 2006.

Paul B. Lackey, Lackey Hershman, Dallas, for Appellant.

Robert W. Coleman, T. Ray Guy, Weil, Gotshal & Manges LLP, Dallas, for Appellee.

Before Justices BRIDGES, FRANCIS, and LANG–MIERS.

## OPINION

Opinion by Justice FRANCIS.

Prospect High Income Fund (Prospect), ML CBO IV (Cayman), Ltd. (ML CBO), Pamco Cayman, Ltd. (Pamco), Pam Capital Funding, L.P. (Pam Capital), Highland Crusader Fund, Ltd. (Crusader), and PCMG Trading Partners VII, L.P. (PCMG) appeal the trial court's summary judgment in favor of Grant Thornton, LLP. We affirm the judgment against Crusader and PCMG. We affirm the judgment as to the remaining appellants on their claims for negligence and third-party beneficiary breach of contract. We reverse and remand the remaining claims.

Appellants are bond and hedge funds managed since 2000 by Highland Capital Management, L.P. (Highland). Subject to periodic reviews by a Highland credit committee, Davis Deadman, a senior portfolio manager at Highland, makes decisions regarding appellants' investments. Between December 10, 1998 and April 4, 2003, in twenty-two transactions, appellants acquired bonds with a par value of $105,000,000 issued by Epic Resorts, LLC (Epic) at prices ranging from par value down to twenty-one percent of par value. After Epic defaulted on the bonds, appellants forced Epic into involuntary bankruptcy and sued those persons and entities they viewed as liable for Epic's default, including Epic's outside auditors, Grant Thornton, LLP.

At the time Epic issued the Epic bonds, it executed an indenture and an escrow and disbursement agreement. The indenture named United States Trust Company of New York (U.S.Trust) as trustee for the bond issue. The indenture required Epic to file audited financial statements with the Securities and Exchange Commission. But for the indenture's requirement, Epic had no mandatory reason to prepare audited financial statements. Section 4.04(b) of

the indenture required Epic's auditors to send U.S. Trust a written statement of negative assurance, "that in making the examination necessary for certification of such financial statements nothing has come to their attention which would lead them to believe that [Epic has] violated any provisions of Article 4, 5, or 6 of this Indenture insofar as they relate to accounting matters or, if any such violation has occurred, specifying the nature and period of existence thereof...."

The escrow and disbursement agreement governed the payment of semiannual interest due on the Epic bonds. The escrow and disbursement agreement named U.S. Trust as escrow agent. Epic agreed to open, from the proceeds of the Epic bonds, an escrow account with U.S. Trust in the initial amount of $16,900,000. Thereafter, Epic was required to maintain a minimum account balance of $8,450,000 to serve as security for the bondholders.

In accordance with the indenture, Epic prepared financial statements for the years 1999 and 2000. Both financial statements include Note "F" which declares that, "[t]he Company maintains $8,450,000 at all times in escrow to cover the next required interest payment." Epic engaged Grant Thornton to audit the 1999 and 2000 financial statements.

While auditing Epic's 1999 financial statement, Grant Thornton discovered that Epic had opened a cash management account with U.S. Trust rather than an escrow account and the account did not contain the required minimum balance. In a deposition, Sirojni Dindial, U.S. Trust's officer in charge of the Epic account, stated that she was unaware of the escrow and disbursement agreement and did not know that U.S. Trust was appointed as an escrow agent.

As part of its auditing process, Grant Thornton's auditors read the indenture and the escrow and disbursement agreement and understood the documents' requirements. When deposed, Kenneth Banet, Grant Thornton's partner overseeing the Epic audit, testified that he believed U.S. Trust was allowing Epic to dip below the minimum balance as long as Epic had enough cash in all of its accounts to meet the minimum balance requirement. Banet was not concerned about the account shortfall because every time Grant Thornton checked, Epic had around $12,000,000 in total escrow funds available. Banet interpreted Note "F" as requiring Epic to maintain the minimum balance, and but not necessarily keep $8.45 million in a specific escrow account. Grant Thornton's audit papers show Epic's account held $6,782,956 on December 31, 1999.

Although Grant Thornton knew Epic was not maintaining the minimum balance in a designated escrow account, it issued audit reports providing that the 1999 and 2000 financial statements fairly presented Epic's financial position in all material respects. Epic filed its audited financial statements with the SEC on April 14, 2000 and April 17, 2001 as part of its Form 10–K disclosures. Additionally, after conducting the 1999 audit, Grant Thornton issued to U.S. Trust the statement of negative assurance required by section 4.04(b) of the indenture. Grant Thornton could not locate a 4.04(b) statement in connection with the audit of the 2000 financial statement.

Despite the shortfall in the account, Epic paid the bond interest on schedule until June 15, 2001. On that date, although it claimed it had the money to do so, Epic failed to pay the interest due. Thomas Flatley, Epic's chief executive officer, testified at his deposition that Epic was forced to use the bond interest to pay operating expenses after a lender did not renew Epic's credit facility.

After Epic defaulted on its interest payment, appellants discovered the problems with the escrow account and other alleged problems with Grant Thornton's audits, including its failure to issue a "going concern" warning about the lender's nonrenewal of Epic's credit facility. On July 19, 2001, appellants Pamco and Pam Capital forced Epic into involuntary bankruptcy.

On February 22, 2002, appellants sued Grant Thornton for fraud, negligent misrepresentation, negligence, third-party-beneficiary breach of contract, conspiracy to commit fraud, and aiding and abetting fraud. Even after discovering the alleged fraud and filing suit, Deadman bought Epic bonds, at deep discounts to par value, for appellants Crusader and PCMG.

Grant Thornton moved for both traditional and "no evidence" summary judgment, contending that the plaintiffs were barred from recovering on their claims because its alleged misrepresentations did not cause them any losses as a matter of law and there was no evidence that they actually relied or justifiably relied upon its representations. Grant Thornton further contended that each of the plaintiffs' claims was either barred as a matter of law or there was no evidence to support an essential element of each claim. Finally, Grant Thornton contended that the plaintiffs could not recover because appellants' agent knew about Epic's problems and that knowledge should be imputed to appellants. The trial court granted summary judgment to Grant Thornton.

■ Because the trial court did not explain why it granted summary judgment, appellants must show on appeal that each ground alleged by Grant Thornton is insufficient to support summary judgment. *See Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex.1995). We will affirm if any of Grant Thornton's grounds has merit. *See id.*

In reviewing the evidence, we "examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion." *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex.2005). If our review shows that Grant Thornton has conclusively negated an essential element of each of appellants' causes of action, then it is entitled to traditional summary judgment. *See* Tex.R. Civ. P. 166a(c); *Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex.2002).

If our review shows there is no evidence of an essential element of appellants' claims, then Grant Thornton is entitled to "no evidence" summary judgment. *See* Tex.R. Civ. P. 166a(I); *Grant*, 73 S.W.3d at 215. In determining whether there is no evidence, we examine the record for evidence that would enable reasonable and fairminded jurors to differ in their conclusions. *See Wal–Mart, Stores Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex.2006) (per curiam) (citing *Keller*, 168 S.W.3d at 822).

In eight issues, appellants contend that the trial court erred in granting summary judgment generally and on each possible ground Grant Thornton raised. We turn first to those issues where we agree with the trial court that summary judgment was appropriate.

In their fifth issue, appellants argue their negligence claim does not fail as a matter of law. Appellants alleged that Grant Thornton committed negligence, gross negligence, and/or professional negligence in auditing Epic's financial statements and reporting the audit results. They maintained Grant Thornton owed them a duty of reasonable care because Epic retained it specifically to complete work to guide them in their business and it knew they were relying upon its work.

Grant Thornton moved for summary judgment on the grounds that the economic loss rule barred recovery, there was no privity of contract, and third parties may not sue accountants for negligence.

Appellants contend that the economic loss rule should not bar their negligence claim because the parties are not "contractual strangers," they are third-party beneficiaries of Grant Thornton's contract with Epic, and the economic loss rule does not apply to professional malpractice. Appellants assert Grant Thornton owed them a duty of care because it was hired to audit Epic's financial statements for their benefit. Appellants argue that Pennsylvania law controls their third-party beneficiary claim and Pennsylvania permits third parties to sue for breach of contract. None of appellant's contentions are meritorious.

■■■ To recover damages for negligence, a plaintiff must show either a personal injury or property damage and not merely economic harm. *Express One Int'l, Inc. v. Steinbeck,* 53 S.W.3d 895, 898–99 (Tex.App.-Dallas 2001, no pet.). In this case, the evidence shows only alleged economic damages. Accordingly, appellants may not assert a negligence claim. *See id.*

■■■ Appellants' professional negligence claim requires privity of contract. *See McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests,* 991 S.W.2d 787, 792 (Tex.1999). A third party may, under certain circumstances, pursue a claim of negligent misrepresentation against a professional. *See McCamish,* 991 S.W.2d at 792; *Abrams Ctr. Nat'l Bank v. Farmer, Fuqua & Huff, P.C.,* No. 08–05–00140–CV, 2005 WL 2806316, *5, — S.W.3d —, —— (Tex.App.-El Paso 2005, no pet.) (applying *McCamish* to accountants); *Alpert v. Crain, Caton, & James, P.C.,* 178 S.W.3d 398, 405 (Tex. App–Houston [1st Dist.] 2005, pet. denied). In a footnote, appellants cite two authorities they inter-

pret as permitting third-party negligence claims against accountants. *See Hendricks v. Grant Thornton,* 973 S.W.2d 348 (Tex.App.-Beaumont 1998, pet. denied); *Brown v. KPMG Peat Marwick,* 856 S.W.2d 742 (Tex.App.-El Paso 1993, writ denied). Both decisions, however, precede *McCamish,* which clarified the privity requirement. Moreover, while *Hendricks* and *Brown* discuss "negligence" actions against accountants, the claims in both cases involve negligent misrepresentations. *See Hendricks,* 973 S.W.2d at 365; *Brown,* 856 S.W.2d at 748. We conclude appellants may not assert a claim for professional negligence.

Likewise, we reject appellants' contention that as alleged beneficiaries of the audit, they have an undocumented contractual relationship with the parties. Appellants cite no authority holding that the intent to bestow the information upon them projects them into privity with Grant Thornton nor gives them any enforceable contractual rights. We note that section 4.04(b) of the indenture expressly absolves Grant Thornton of any liability for failure to discover knowledge of violations.

We will discuss, and reject, appellants' third-party beneficiary contention in connection with appellants' sixth issue, *infra.* Accordingly, we conclude Grant Thornton has shown as a matter of law that appellants are not entitled to recover on their negligence theories and there is no genuine issue of material fact. We overrule appellants' fifth issue.

In their sixth issue, appellants maintain that their claim for third-party beneficiary breach of contract does not fail as a matter of law. Appellants argue that Epic engaged Grant Thornton for the benefit of the bondholders to assure them that Epic's financial statements were free of material misstatements. Grant Thornton responds

that summary judgment was proper because appellants' claim is a tort, rather than a breach of contract, under Texas law. *See Univ. Nat'l Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex.App.-San Antonio 1989, no writ). Appellants contend that controlling Pennsylvania law permits suits against accountants under both contract and tort theories.

Determining the applicable law is a question of law. *Minn. Mining & Mfg. Co. v. Nishika Ltd.*, 955 S.W.2d 853, 856 (Tex.1996). We review the trial court's determination de novo and apply the substantive law of the state with the "most significant relationship" to the dispute. *Id.* Because appellants' claim involves alleged misrepresentations made in one state and relied upon in another, we consider the following factors:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicile, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

*Grant Thornton, L.L.P. v. Suntrust Bank*, 133 S.W.3d 342, 358 (Tex.App.-Dallas 2004, pet. filed), (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 148(2) (1971)). "If any two of the above-mentioned contacts, apart from the defendant's domicile, state of incorporation or place of business, are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues." *Id.*, (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 148 cmt. j (1971)).

Although the relationship between Grant Thornton and Epic was centered in Pennsylvania where the audit occurred, Deadman received and relied upon the representations in Texas. Thus, the trial court would not have erred in applying Texas law to this dispute. *See id.* Applying Texas law, appellants have no standing to pursue their claims as a breach of contract. *See Averitt v. PriceWaterhouseCoopers, L.L.P.*, 89 S.W.3d 330, 334 (Tex. App.-Fort Worth 2002, no pet.); *Univ. Nat'l Bank*, 773 S.W.2d at 710.

Moreover, under Texas law, to sue as a third-party beneficiary, a claimant must show (1) the obligation to the third party is fully developed, (2) the contracting parties unmistakably contemplated benefitting the claimant, and (3) the contract vests in the claimant the right to sue to enforce the contract. *Whitten v. Vehicle Removal Corp.*, 56 S.W.3d 293, 312 (Tex. App.-Dallas 2001, no pet.). Appellants present no evidence showing that a contract between Epic and Grant Thornton vests in appellants the right to sue to enforce the contract. Accordingly, we conclude no genuine issue of material fact exists, and Grant Thornton is entitled to summary judgment as a matter of law, on appellants' claims for third-party beneficiary breach of contract. We overrule appellants' sixth issue.

In their third issue, appellants contend Grant Thornton's motion for summary judgment on their fraud claim fails. In pleading their fraud action, appellants assert Grant Thornton "made untrue representations of fact to Plaintiffs and intentionally omitted certain material facts

regarding whether the Minimum Balance in the escrow account was being maintained and regarding the financial condition of Epic Resorts." Appellants alleged Grant Thornton made the false statements to dissuade them from acting to uncover the truth and prevent their losses.

 To establish fraud, a plaintiff must show that (1) the defendant made a material, false representation; (2) it either knew was false or made it as a positive assertion without any knowledge of its truth; (3) it intended to induce the plaintiff to act upon the representations; and (4) the plaintiff actually and justifiably relied upon its representations and thereby suffered injury. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex.2001). An intent to induce requires more than mere foreseeability; rather, the maker must have at least reason to expect that the recipient will rely. *Id.* at 579–80.

In its motion for summary judgment, Grant Thornton argued appellants could not prove the elements of intent to induce reliance and justifiable reliance. On appeal, appellants challenge both of Grant Thornton's arguments.

Regarding Grant Thornton's intent to induce, appellants contend that intent is necessarily a fact question. *See Spoljaric v. Percival Tours,* 708 S.W.2d 432, 434 (Tex.1986). Moreover, appellants assert Grant Thornton either knew or had reason to expect that they would be relying upon its representations because (1) the issuance of the Epic bonds was the sole reason why Epic was required to file audited financial statements, (2) Grant Thornton was hired specifically to provide the written statement of negative assurance required by section 4.04(b) of the indenture, and (3) Grant Thornton's work papers contain a list of each of Epic's warrant holders who are also the bondholders.

 Grant Thornton responds that it did not intend to induce appellants' reliance and any such reliance was unjustified. Grant Thornton asserts that although it may be foreseeable that public bondholders would rely upon audit reports, *Pacific Mutual* expressly excludes such persons from filing fraud claims. Grant Thornton further contends that delivering the statement of negative assurance did not satisfy *Pacific Mutual's* "reason to expect" standard because the statement was delivered only to U.S. Trust and not to the individual bondholders. Finally, Grant Thornton maintains it had no access to appellants' identities as bondholders.

In *Pacific Mutual,* the Texas Supreme Court determined "the scope of an accounting firm's liability for making fraudulent misrepresentations in an audit report." *Pacific Mutual,* 51 S.W.3d at 574. In that case, an investor acquired notes issued by InterFirst Corporation before it was merged into RepublicBank Corporation. Before investing in the InterFirst notes, the investor reviewed RepublicBank's pre-merger audited financial statements. After the investor bought the notes, the merged bank failed, rendering the InterFirst notes worthless. The investor sued RepublicBank's auditors, and the trial court granted summary judgment to the auditors.

Applying section 531 of the Restatement (Second) of Torts, the supreme court determined that an auditor would be liable for misrepresentations only to those persons whom the auditor intended or had reason to expect to rely upon the misrepresentation. *Id.* at 578. The supreme court rejected a standard of mere foreseeability of reliance; rather, the plaintiff's "reliance must be 'especially likely' and justifiable, and the transaction sued upon must be the type the defendant contem-

plated." *Id.* at 580. One has reason to expect reliance if the defendant has information that would lead a reasonable man to conclude that it is "especially likely" that it would reach the plaintiff and influence the plaintiff's conduct. *Id.* at 581. The fact that it may be industry custom to rely upon the documents is insufficient to meet the standard. *Id.* In upholding the summary judgment, the supreme court concluded that the defendant had negated the intent-to-induce-reliance element of the investor's fraud claim because its knowledge that investors would rely upon the widely-disseminated financial statements was insufficient to show it was "especially likely" that investors would rely upon its RepublicBank opinion in purchasing Inter-First notes. *Id.* at 582–83.

The present case is distinguishable from *Pacific Mutual.* The plaintiff's reliance in *Pacific Mutual* was foreseeable, but not especially likely. In contrast, there is some evidence and a genuine issue of material fact regarding whether appellants' reliance was foreseeable and especially likely.

Section 4.03(a) of the indenture provides Epic "shall file with the Commission and shall furnish to the Trustee *and each Securityholder* within 15 days after it files them with the Commission copies of the quarterly and annual reports and of the information, documents, and other reports . . . to be filed pursuant to Section 13 or 15(d) of the Exchange Act. . . ." Epic bondholders are "Securityholders" as that term is defined in section 1.01 and the preamble of the indenture. Prospect was a securityholder at the time the 1999 10–K was issued, and all appellants except Crusader and PCMG were securityholders at the time the 2000 10–K was issued. Thus, there is a fact issue regarding whether Grant Thornton had reason to expect that it was especially likely that appellants

would receive and rely upon Epic's audited financial statements. *See id.* at 581. Similarly, a genuine issue of material fact exists regarding whether the section 4.04(b) assurance shows that Grant Thornton had information that would cause a reasonable man to conclude that the existing bondholders would be especially likely to rely upon Epic's audited financial statements. *See id.* We conclude appellants have shown that summary judgment grounded on their failure to show Grant Thornton's intent to induce reliance would not be appropriate.

■■ Turning to the element of justifiable reliance, in its motion for summary judgment, Grant Thornton argued that appellants' decisions to invest during certain periods when, according to Grant Thornton, they could not have justifiably relied upon its representations, precluded them from establishing their claims. Specifically, Grant Thornton questioned whether appellants justifiably relied upon its representations in investing (1) before it issued its audit opinions, (2) during two periods when the audit opinions were "stale" due to Epic making interest payments or the mere passage of time, and (3) after the filing of this case. We will consider each time period in turn.

The summary judgment evidence shows Prospect bought Epic bonds during 1998 and 1999 before Grant Thornton issued its audit opinions. Thus, Grant Thornton observed, Prospect could not have relied upon its representations in purchasing the Epic bonds. *See Eagle Prop., Ltd. v. KPMG Peat Marwick,* 912 S.W.2d 825, 827 (Tex.App.-El Paso 1995, writ denied) (no fraud claim when false representation made after transaction was completed). Appellants, however, contend that their reliance transcended purchasing the Epic bonds. Appellants argue that even after purchasing the bonds, they relied on Grant

Thornton's representations in deciding whether to continue holding the bonds. Absent their reliance upon Grant Thornton's misrepresentations, appellants contend, they would have forced Epic to comply with its loan covenants or forced it into bankruptcy, as stated in Deadman's affidavit. We agree with appellants that there are genuine issues of material fact regarding whether Prospect's post-purchase reliance was justified.

■■■ Regarding investments made between December 13, 2000 and April 17, 2001, Grant Thornton sought summary judgment on the ground appellants could not justifiably rely on its representations because these investments were made after the 1999 audit opinion became "stale," but before the 2000 audit opinion was issued. Grant Thornton asserted that one may only rely on a financial statement for a reasonable period of time, especially if the party knows or should know that the financial statement may no longer be accurate. Although the 1999 financial statement represented that Epic had "cash in escrow" of $12,004,000, Grant Thornton pointed out that Epic paid interest from the account on June 15, 2000 and December 15, 2000. Grant Thornton contended that appellants could not justifiably rely upon the cash escrow figure in the financial statement unless Deadman first investigated and verified that the account had been replenished after Epic paid the interest. Because Deadman's deposition testimony shows he merely assumed Epic replenished the account and he did not investigate, Grant Thornton contends appellants could not justifiably rely upon its "stale" audit opinion. *See J.M. Radford Grocery Co. v. Halper,* 274 S.W. 1023, 1024 (Tex.Civ.App.-El Paso 1925, no writ) (concluding party can only rely upon financial statement for reasonable time); *Thigpen v. Locke,* 363 S.W.2d 247, 251 (Tex.1962) (concluding one cannot rely upon another's representations in absence of exercise of reasonable diligence).

On appeal, appellants contend there is no summary judgment evidence suggesting that one cannot rely upon an audit opinion after a certain period of time. Appellants assert they need not investigate the underlying facts of the escrow account before relying on Grant Thornton's representations. Appellants distinguish *Thigpen* because its plaintiff did not read contracts he signed while Deadman, in contrast, said he had read Grant Thornton's documents.

Deadman averred that it is industry practice to rely upon audited, publicly filed, financial statements for the lesser of one year or until updated financial statements are filed. Grant Thornton offers no contrary evidence showing when a financial statement becomes "stale." The representation at issue in *Radford* was made four years before the act of reliance. *See Radford,* 274 S.W. at 1024. Moreover, Banet admitted that Grant Thornton knew the escrow account was not properly established. No evidence or authority establishes that a bondholder must independently investigate before relying upon a bond issuer's audited financial statements. At best, the adequacy of appellants' investigation creates a fact issue.

Grant Thornton next contended no evidence exists to show that its representations affected appellants' investing decisions, and thus no justifiable reliance, for investments made between April 17, 2001 and June 20, 2001. Deadman, however, averred that Grant Thornton's representations affected both purchasing and pricing decisions on the bonds, thus raising a fact issue.

■■■ Regarding the bonds purchased after suit was filed, however, we cannot agree that appellants raised a fact issue.

Appellants filed suit against Grant Thornton on February 22, 2002. On February 26, 2002, Deadman purchased Epic bonds with a par value of $5,000,000 for Crusader at a price of twenty-one percent of par value. Subsequently, in two purchases in April 2002 and a final purchase on April 4, 2003, Deadman bought an additional amount of Epic bonds with a par value of $26,000,000 for Crusader and PCMG at a price of twenty-six percent of par value. Neither Crusader nor PCMG had owned any Epic bonds prior to the filing of appellants' lawsuit.

To explain how Crusader and PCMG could have continued to rely upon representations appellants were alleging to be fraudulent and negligent, appellants contend that they did not understand the full extent of the problems with the audit until they received access to Grant Thornton's working papers in October 2002. Appellants further contend that, despite the knowledge Deadman had about the alleged inaccuracy of the representations, Crusader and PCMG succeeded to the rights and legal claims of the previous owners of the Epic bonds they purchased.

PCMG's April 4, 2003 purchase of Epic bonds with a par value of $5,000,000 took place six months after appellants received Grant Thornton's working papers. Thus, Deadman was undeterred from buying Epic bonds, at fire sale prices, despite having full knowledge of the problems with the audits. The record does not show who previously owned the bonds Crusader and PCMG purchased nor does it show that the previous owners relied upon Grant Thornton's work. Deadman, a sophisticated and experienced investor, controlled the investment decisions for all appellants. We conclude that Grant Thornton met its burden of showing as a matter of law that Crusader and PCMG did not justifiably rely upon its representations and that the representations did not cause them to invest to their detriment. *See Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.,* 81 F.3d 606, 615 (5th Cir.1996) (concluding that sophisticated investor could not possibly have justifiably relied upon audited financial statements after discovering audit flaws). Therefore, we conclude the trial court did not err in granting Grant Thornton summary judgment against Crusader and PCMG on their claim for fraudulent misrepresentation. Except as to Crusader and PCMG, we sustain appellants' third issue.

■ In their fourth issue, appellants contend Grant Thornton's motion for summary judgment on their negligent misrepresentation claim fails. A claim for negligent misrepresentation arises if the maker, in the course of his business or a transaction in which he has a pecuniary interest, supplies false information for the guidance of the recipients in their business, the maker did not exercise reasonable care or competence in obtaining or communicating the information, and the recipients suffer pecuniary loss by justifiably relying on the representation. *See Fed. Land Bank Ass'n of Tyler v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991).

■ The parties first dispute whether Grant Thornton provided false information. Appellants point out that Grant Thornton knew the minimum balance requirement was not being maintained and that the shortfall in the escrow account violated the indenture and the escrow agreement. Because of deficiencies in Grant Thornton's audit and the problem with the escrow account, appellants contend that at least a fact question exists on negligent misrepresentation with regard to Grant Thornton's representations that (1) it conducted its audit in accordance with generally accepted accounting principles, (2) the Epic financial statements present

fairly, in all material respects, Epic's financial position, and (3) the statement of negative assurance made to appellants' representative, U.S. Trust, that Grant Thornton had not discovered any violations of articles 4, 5, and 6 of the indenture. Grant Thornton responds that its audit opinions are not misrepresentations because Epic did have the necessary amount in escrow somewhere and, therefore, Note "F" was true. We agree with appellants.

Note "F" literally states that Epic "maintains $8,450,000 at all times in escrow *to cover the next required interest payment.*" (Emphasis added). Because no evidence shows Epic's other cash was reserved to cover its next interest payment, the veracity of Note "F" is a genuine issue of material fact. Appellants point out that Banet admitted he knew Epic was violating the escrow agreement and indenture by failing to maintain the minimum balance. Thus, the accuracy of Grant Thornton's representations regarding the fair presentation of Epic's financial position and the section 4.04(b) representation present genuine issues of material fact. Regarding the representation about the quality of Grant Thornton's audits, appellants placed into the summary judgment evidence an affidavit from Certified Public Accountant James A. Smith describing numerous deficiencies with the audits. Genuine issues of material fact are presented on all three representations appellants identify as misrepresentations.

The parties next dispute whether appellants qualify as members of the limited class of persons entitled to sue a professional for negligent misrepresentation. The Texas Supreme Court has established that professionals may be liable for negligent misrepresentations to third parties despite the absence of privity. *See McCamish,* 991 S.W.2d at 792. The professionals' potential liability, however, is not unlimited. *See id.* at 793–94. A third party may sue a professional for negligent misrepresentations delivered to a known party for a known purpose. *Id.* at 794. If Grant Thornton's audit opinions were negligent misrepresentations, its liability would be limited to (1) plaintiffs specifically identified as recipients of the representations, and (2) plaintiffs who, although not specifically named, belong to a group or class it knew would receive the information. *Abrams,* —— S.W.3d at ——, 2005 WL 2806316, at *6.

Appellants contend that whether Grant Thornton knew or should have known that appellants would receive the representations is a fact issue for trial. Additionally, appellants contend evidence showing the audit was conducted for their benefit creates a fact issue regarding whether they fall within the limited class entitled to sue.

Grant Thornton argued the bond investors are not within the limited class of persons it intended to influence when it issued its audit opinions because it had no means to identify individual investors. Citing *Pacific Mutual* and this Court's opinion in *Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.,* 715 S.W.2d 408 (Tex. App.-Dallas 1986, writ ref'd n.r.e.), Grant Thornton contends that public bondholders should be excluded as third-party plaintiffs because auditors, while aware that bond investors are likely to review audited financial documents before investing, do not know which specific investors will receive and be influenced by the representations. Grant Thornton further asserts that appellants cannot treat the section 4.04(b) statement as a negligent misrepresentation because U.S. Trust was not required to pass it on to them.

■ Both *Pacific Mutual* and *Blue Bell* are distinguishable from this case. Unlike the investor in *Pacific Mutual,* appellants already owned Epic bonds. Thus,

they are not merely members of a large universe of potential investors. In *Blue Bell*, a case decided before *McCamish* and relying on an expansive, foreseeability test for inclusion in the limited class, this Court concluded that a fact issue existed regarding whether existing trade creditors fell within the limited class of plaintiffs eligible to sue for negligent misrepresentation. *See Blue Bell*, 715 S.W.2d at 413.

Without deciding whether *McCamish* overturns *Blue Bell*, we conclude that there is sufficient evidence for reasonable jurors to disagree and a genuine issue of material fact regarding whether appellants qualify for inclusion within the limited class entitled to sue. Some evidence shows Epic ordered the audit solely to satisfy the bond indenture. Some evidence shows that the 4.04(b) statement was generated solely to protect the bondholders, and it was delivered to their representative. Grant Thornton cites no authority excluding existing investors from the limited class of potential claimants. To the contrary, Grant Thornton's authorities suggest that Texas might allow such a suit. *See Scottish Heritable Trust*; 81 F.3d at 614; *Tara Capital Partners, L.L.P., et al v. Deloitte & Touche, L.L.P.*, No. 05–03–00746–CV, 2004 WL 1119947 (Tex.App.-Dallas May 20, 2004, no pet.) (assuming, without deciding, that existing shareholders might constitute limited group). *See also Abrams*, —— S.W.3d at ——, 2005 WL 2806316, at *1,7 (stating, in dicta, that auditor undoubtedly owed duty to client's existing lender when auditor knew opinion furnished for benefit of government agency would be passed on to existing lender as requirement of credit line). Thus, we conclude that summary judgment could not be granted on the ground appellants are excluded from the limited class of persons entitled to rely upon Grant Thornton's representations.

Finally, Grant Thornton contended appellants cannot establish causation or reliance for their negligent misrepresentation claim. Except for the claims of Crusader and PCMG, we will reject this contention in our discussion of appellants' second issue, *infra*. We sustain appellants' fourth issue.

In their seventh issue, appellants assert summary judgment is inappropriate on their claims for conspiracy to commit fraud and aiding and abetting fraud. Appellants alleged that Grant Thornton conspired with Epic to commit fraud by making untrue representations and omitting material facts regarding the escrow account and Epic's financial condition. Appellants further pleaded that Grant Thornton knowingly and substantially assisted Epic in committing fraud by making false statements, assisting Epic in making false statements, and omitting material facts regarding the escrow account and Epic's financial condition.

 As the parties' briefs acknowledge, the Texas Supreme Court has not recognized a separate tort of aiding and abetting fraud. *See Pac. Mut.*, 51 S.W.3d at 583 n. 7. It is not necessary for us to determine whether these claims are separate torts. "A civil conspiracy involves a combination of two or more persons with an unlawful purpose or a lawful purpose to be accomplished by unlawful means." *Id.* The summary judgment evidence shows Grant Thornton knew the escrow account was not set up properly and that Epic was not complying with its obligations under the indenture. Nevertheless, Grant Thornton rendered favorable audit reports and certified to U.S. Trust that it had not found any accounting violations. Whether Grant Thornton did so with the necessary intent to constitute fraud, conspiracy, or aiding and abetting fraud is a fact question unamenable to summary judgment. *See*

*Spoljaric,* 708 S.W.2d at 435. Accordingly, we sustain appellants' seventh issue.

In the summary judgment proceedings, in addition to its specific argument as to why each of appellants' claims should be barred, Grant Thornton also raised two general grounds contending that all of appellants' claims are precluded because U.S. Trust's knowledge is imputed to them and because they cannot establish the necessary elements of causation or reliance. Appellant raises an issue on appeal regarding each ground.

 In their eighth issue, appellant's question whether their claims fail as a matter of law because knowledge of their agent is imputed to them and whether Grant Thornton's imputed knowledge argument was timely raised in the trial court. Without deciding the argument's timeliness, we conclude summary judgment would not be proper.

 Because Grant Thornton first raised its imputed knowledge ground in its summary judgment reply, appellants contend it cannot be the basis for summary judgment. Some authorities support appellants' position. *See, e.g., TIG Ins. Co. v. Via Net,* 178 S.W.3d 10, 16 n. 6 (Tex.App.-Houston [1st Dist.] 2005, pet. filed); *Larue v. Chief Oil & Gas, L.L.C.,* 167 S.W.3d 866, 875–76 (Tex.App.-Fort Worth 2005, no pet.). The supreme court has stated that the trial court may grant summary judgment on "issues raised in the motion, response, and any subsequent replies." *Stiles v. Resolution Trust Corp.,* 867 S.W.2d 24, 26 (Tex.1993). In the same opinion, however, the supreme court stated, "we hold that a summary judgment cannot be affirmed on grounds not expressly set out in the motion or response." *Id.* Grant Thornton contends it raised the issue indirectly in arguing causation and justifiable reliance. Oblique references, however, do not comport with the require-ment that the grounds for summary judgment be plainly stated. *See McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993) (explaining rationale for requiring clear statement of grounds for summary judgment). Because Grant Thornton did not show that U.S. Trust was the type of agent whose knowledge is imputed and because there are fact issues regarding U.S. Trust's knowledge and whether U.S. Trust held an adverse interest, we need not decide whether Grant Thornton could first raise this claim in its reply.

 The parties agree that U.S. Trust was the bondholders' agent and representative. Grant Thornton cites authorities holding that an agent's knowledge is imputed to its principal. *See, e.g., Fireman's Fund Indem. Co. v. Boyle Gen. Tire Co.,* 392 S.W.2d 352, 357 (Tex.1965). U.S. Trust, however, was functioning as an escrow agent for the parties. An escrow agent owes fiduciary duties to both parties in a transaction including the duty of loyalty, the duty to make full disclosure, and the duty to exercise a high degree of care to conserve the money placed in escrow and pay it only to those persons entitled to receive it. *See Holder–McDonald v. Chicago Title Ins. Co.,* 188 S.W.3d 244, 248 (Tex.App.-Dallas 2006, pet. denied). Grant Thornton's authorities all involve agents operating for a single principal. No authority before the Court establishes that an escrow agent's knowledge should be imputed to a party to an escrow agreement. Thus, Grant Thornton has not shown, as a matter of law, that U.S. Trust's knowledge should be imputed to appellants.

Moreover, even if we assume U.S. Trust's knowledge would ordinarily be imputed to the bondholders, appellant contends there is no summary judgment evi-

dence showing U.S. Trust and appellants knew about Grant Thornton's misrepresentations. To the contrary, Dindial's deposition testimony raises a genuine issue of material fact regarding the extent of U.S. Trust's knowledge of its role as escrow agent.

Finally, appellant contends an agent's knowledge is not imputed to its principal if the agent has an adverse interest in not revealing it. *See Arabesque Studios, Inc. v. Acad. of Fine Arts Int'l, Inc.,* 529 S.W.2d 564, 568 (Tex.App.-Dallas 1975, no writ). Undisputed summary judgment evidence shows that U.S. Trust failed to establish or monitor the escrow account and failed to notify the bondholders of Epic's default. We conclude that a genuine issue of material fact exists regarding whether U.S. Trust had an adverse interest so as to preclude the imputation of its knowledge to appellants. Accordingly, we sustain appellants' eighth issue.

In their second issue, appellants contend their claims do not fail as a matter of law due to an inability to establish the elements of causation and reliance. In its motion for summary judgment, Grant Thornton put forward numerous arguments asserting that appellants could not recover on any of their claims because the alleged misrepresentations did not cause them any loss and they could not and did not rely or justifiably rely upon the representations. Appellants responded that the evidence shows they did rely upon Grant Thornton's work in making critical decisions regarding their ownership of the Epic bonds. Except for Crusader and PCMG, we agree with appellants.

■■■■ Because we have already concluded that summary judgment was proper on appellants' negligence and third-party beneficiary breach of contract claims, we will confine our discussion to the remaining claims. In its motion for summary judgment, Grant Thornton correctly observed that causation and reliance were necessary elements of all of appellants' remaining claims. *See Pac. Mut.,* 51 S.W.3d at 577, 583 (justifiable reliance causing damages is element of fraud and conspiracy and aiding and abetting fraud claims are premised on finding of fraud); *Fed. Land Bank,* 825 S.W.2d at 442 (negligent misrepresentation requires plaintiff to suffer pecuniary loss by justifiably relying on representation). To establish the element of causation, a plaintiff must show that the defendant's acts or omissions were a cause-in-fact of foreseeable losses. *See Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex.2003). The defendant's acts or omissions are a cause-in-fact if the plaintiff can show, beyond mere conjecture, guess, or speculation, "that an act or omission was a substantial factor in bringing about an injury which would not otherwise have occurred." *See id.* A plaintiff establishes reliance by showing that the defendant's acts and representations induced it to either act or refrain from acting, to its detriment. *See TCA Bldg. Co. v. Entech, Inc.,* 86 S.W.3d 667, 674 (Tex. App.-Austin 2002, no pet.).

■■■ As a preliminary matter, the parties dispute which representations are material in this case. Appellants contend that they relied on both the audit opinions and the statement of negative assurance to U.S. Trust. Because only U.S. Trust received the section 4.04(b) assurance and the indenture did not require U.S. Trust to forward it to the bondholders, Grant Thornton responds that appellants could rely upon only two representations: (1) that it performed its audit in accordance with generally accepted auditing standards; and (2) that, in all material respects, the financial statements fairly present Epic's financial position, results of operations, and its cash flow in accordance

with generally accepted accounting principles. Grant Thornton points out Note "F" is Epic's representation and it contends that Note "F" is true because Epic had over $8.45 million in escrow at the time, although the money was not in the designated account. We conclude that there is a fact issue, at least, regarding which representations are at issue.

Dindial testified that she was unaware that U.S. Trust was designated as the escrow agent and so Epic's violation of the escrow account requirements went unnoticed. Additionally, John Guiliano, U.S. Trust's senior administrator in the Corporate Trust Group and the officer with overall responsibility for the Epic account, averred in an affidavit that he relied upon Grant Thornton's section 4.04(b) negative assurance. Had Grant Thornton informed him that Epic's account did not comply with the indenture, Guiliano averred that U.S. Trust "would have taken whatever steps may have been required under the Indenture."

Without regard to whether U.S. Trust was obligated to pass on the section 4.04(b) statement, we cannot conclude as a matter of law that the 4.04(b) statement did not harm appellants. The record contains evidence suggesting that U.S. Trust would have corrected the account problem if it had been brought to its attention. Placing the cash into an escrow account would have stopped Epic from using the cash to pay its operating expenses. Reasonable and fairminded jurors could conclude that by obfuscating the need for corrective action, Grant Thornton's 4.04(b) statement allowed Epic the opportunity to divert the cash escrow from its intended purpose. Thus, we conclude that there is a genuine issue of material fact, and reasonable, fairminded jurors could reach different conclusions, regarding the materiality of the audit opinions and the section 4.04(b) assurance.

Having concluded that all three representations are potentially material, we turn to the summary judgment merits of the argument. In moving for summary judgment, Grant Thornton argued that its alleged misrepresentations did not affect appellants' actions nor did they cause appellants any damages. To support its contention, Grant Thornton cited to passages from Deadman's deposition testimony showing that Deadman was unable to say what he would have done differently had he known that the escrow account was not established properly. During the summary judgment proceedings and now on appeal, Grant Thornton interprets the selected passages as conclusive evidence that its representations did not cause appellants' damages.

Appellants contend the passages do not establish Grant Thornton's entitlement to summary judgment because the evidence shows they reviewed and relied upon Grant Thornton's work in making critical decisions regarding their ownership of the bonds and their relationship with Epic. We agree with appellants.

Although Deadman could not articulate a course of action, at another point in his deposition, he described the existence of the escrow account as "a material aspect of the deal," and he stated that if he had known about the shortfall in the escrow account, "there is a high probability we never would have invested in the bonds." Moreover, in his affidavit in opposition to summary judgment, Deadman averred that he:

> would not have purchased the Epic Resorts bonds at the price that I purchased them. If the Epic bonds were in default, then I would not have purchased the bonds for [Prospect, ML CBO, Pamco, and Pam Capital]. Additionally, had

I known the full extent of the deficiencies in [Grant Thornton's] audit, then I would not have purchased the bonds for Plaintiffs PCMG and Crusader at the price that I did.

Deadman further averred that if, after purchasing the Epic bonds, he had learned that Epic was not maintaining the minimum balance in the escrow account, he would have "taken steps to either force management to comply with the Indenture and its related documents or I would have filed Epic Resorts into bankruptcy at the earliest possible date."

■■■ For summary judgment purposes, an affidavit bears equal weight and credibility to deposition testimony. *See Randall v. Dallas Power & Light Co.*, 752 S.W.2d 4, 5 (Tex.1988) (per curiam). In this case, portions of Deadman's affidavit and deposition conflict with other portions of his deposition. Nevertheless, when read together, the deposition and affidavit passages that do suggest Deadman would have acted had he known about the problems with the escrow account and audit raise genuine issues of material fact and constitute some evidence regarding whether Grant Thornton's representations affected appellants' decisions to buy and hold Epic bonds at the applicable market prices. The record contains evidence showing that market prices for the bonds fluctuated, and appellants purchased Epic bonds at prices ranging from par value down to as low as twenty-one percent of par value. Thus, Grant Thornton's evidence of Deadman's alleged failure to identify a course of action does not entitle it to summary judgment. *See Randall*, 752 S.W.2d at 5.

Grant Thornton also contended that appellants could not establish their actual reliance upon its representations because Deadman did not perform sufficient due diligence before investing in the Epic bonds. Deadman could not specifically remember even reading the 10–K filing and he could not produce any copies of Epic's financial statements. Appellants do not address this contention directly other than to assert that the record shows they did rely upon Grant Thornton's representations. The record contains Deadman's assurance that he did read and rely upon Epic's 10–Q and 10–K filings because he always reviewed such documents online before making an investment decision. Whether Deadman's due diligence was sufficient to allow appellants to justifiably rely upon Grant Thornton's audit opinions is an issue of fact.

Grant Thornton also contended that appellants cannot establish causation or reliance because Epic voluntarily defaulted on the June 15, 2001 interest payment, thus breaking the chain of causation. Appellants do not address this argument specifically, but they do point out that they placed Epic into bankruptcy as soon as they learned of Epic's default and they contend that had Grant Thornton timely disclosed the problems with the escrow account, they would have taken action against Epic earlier to prevent or minimize their damages.

The purpose of an escrow account is to place money with a neutral, third party to preserve the funds for disbursement in accordance with the escrow agreement. *See Vector Indus., Inc. v. Dupre*, 793 S.W.2d 97, 101 (Tex.App.-Dallas 1990, no writ). Evidence in the record suggests that had Grant Thornton disclosed the problem with the escrow account in either their 1999 audit opinion or section 4.04(b) statement, appellants and U.S. Trust would have acted to secure the interest money by correcting the account relationship or placing Epic into bankruptcy. Had these steps been taken, Epic, at least arguably, would not have been positioned to

exercise a choice regarding the June 15, 2001 interest payment. We cannot conclude that Grant Thornton has shown as a matter of law that there is a break in the link of causation.

Grant Thornton contended that it was unforeseeable that Epic would be unable or unwilling to make the June 15, 2001 interest payment, that appellants could not have filed Epic into bankruptcy any sooner because of the sixty-day default notice provision in the indenture, and that appellants would not have changed their behavior if Grant Thornton had issued a "going concern" warning about the nonrenewal of Epic's credit facility. Appellants point out that they forced Epic into bankruptcy as soon as possible after learning of the default. Appellants contend there is a fact question regarding whether they could have done so earlier if Grant Thornton had divulged its information regarding problems with the escrow account in 1999, 2000, or earlier in 2001.

Because the bond interest was not safely deposited into an escrow account, we cannot conclude that it was unforeseeable as a matter of law that Epic would not make its interest payment. Even if the April 17, 2001 audit representation came too late to affect the date of the involuntary bankruptcy, Grant Thornton's argument ignores the impact of their earlier, April 14, 2000 audit representation and the section 4.04(b) statement. Section 2(c) of the escrow and disbursement agreement expressly provides that "[f]ailure to maintain the Minimum Balance, which failure shall continue for 60 days following written notice of such failure by the Trustee, shall constitute an Event of Default under the Indenture." Thus, Epic was in default for a substantial period of time before failing to make its interest payment. Because we have already determined that the evidentiary dispute on the auditing of the escrow

account precludes summary judgment on some claims, Grant Thornton's contention that a hypothetical "going concern" warning in its audit opinion would not have affected appellants' behavior is immaterial for summary judgment purposes.

Finally, Grant Thornton contended appellants could not establish that its representations were a cause-in-fact of appellants' damages because many of their investment transactions took place either before Grant Thornton made its representations or after all of the adverse facts were known. Both parties provide more extensive argument regarding this issue in their briefing for appellant's third issue which we have already resolved. For the same reasons we have previously discussed in adjudicating appellants' third issue, we conclude that Grant Thornton established its entitlement to summary judgment as to Crusader and PCMG on all of their claims because its representations could not have caused their alleged losses nor could Crusader and PCMG reasonably rely upon representations Deadman necessarily believed to be either fraudulently or negligently made.

We sustain appellants' second issue as to Prospect, ML CBO, Pamco, and Pam Capital. We overrule appellants' second issue as to Crusader and PCMG.

Returning to appellant's first issue, appellants contend that the trial court erred in granting summary judgment. For the foregoing reasons, we overrule appellants' first issue as to Highland Crusader and PCMG and on the claims for negligence and third-party beneficiary breach of contract, but sustain it as to the remaining appellants and remaining causes of action.

We affirm the trial court's judgment as to Crusader and PCMG. We affirm the trial court's judgment on the remaining appellants' claims for negligence and third-

party beneficiary breach of contract. We reverse the trial court's judgment as to the remaining claims and remand those claims for further proceedings consistent with this opinion.