**GRANT THORNTON LLP, Petitioner,**

v.

**PROSPECT HIGH INCOME FUND, ML CBO IV (Cayman), Ltd., Pamco Cayman, Ltd., and Pam Capital Funding, L.P., Respondents.**

No. 06–0975.

Supreme Court of Texas.

Argued Dec. 9, 2008.

Decided July 2, 2010.

Robert W. Coleman, David Albert Buono II, Joel E. Geary, Brown McCarroll, LLP, Robb L. Voyles, Jessica B. Pulliam, Samara L. Kline, Baker Botts L.L.P., Dallas, TX, Thomas R. Phillips, Kennon Lathem Peterson, Baker Botts L.L.P., Austin, TX, Allyson Newton Ho, Morgan, Lewis & Bockius LLP, Houston, TX, for Petitioner.

Paul Brian Lackey, Michael Philip Aigen, Scott S. Hershman, Lackey Hershman, L.L.P., Dallas, TX, for Respondents.

Douglas W. Alexander, Alexander Dubose & Townsend, L.L.P., Austin, TX, Kelly M. Hnatt, Willkie Farr & Gallagher, New York, NY, for Amicus Curiae, The Texas Association of Certified Public Accountants.

· E. Lee Parsley, E. Lee Parsley, P.C., Austin, TX, for Amicus Curiae, Texans for Lawsuit Reform.

Chief Justice JEFFERSON delivered the opinion of the Court.

Certified accountants audit companies for many purposes, not least of which is to

provide corporate directors with an objective assessment of their companies' performance. Audits are also prepared to give information to a specific investor who the auditor knows will rely on its contents. We must decide whether the law imposes an obligation on the auditor to provide an accurate accounting not to the corporation or known investor, but to anyone who reads and relies on it. We conclude that it does not. Likewise, we hold that the particular investors involved in this case could not have justifiably relied on the audit reports as to purchases made after they knew the corporation was at risk of financial ruin, and they may not substitute their escrow agent's reliance for their own without also being bound by its knowledge. Finally, we reject the investors' "holder" claims—claims not that they bought or sold securities based on the auditor's reports, but that they held them when they otherwise would not have—in the absence of a direct communication with the auditors. For these reasons, we reverse in part the court of appeals' judgment and render judgment that the investors take nothing.

## I. Background[1]

Respondents, Prospect High Income Fund (Prospect), ML CBO IV (Cayman), Ltd., Pamco Cayman, Ltd., and Pam Capital Funding, L.P. (collectively, "the Funds"), are bond and hedge funds. Over a five-year period, the Funds bought bonds from Epic Resorts, LLC (Epic), a vacation timeshare operator, at prices ranging from par value to 21% of par value. Epic is not a party to this case.

In 1998, Epic registered its bonds with the Securities and Exchange Commission (SEC) and sold them on the open market. The bonds, secured by Epic's assets, were high yield, below investment grade securities.[2] They were governed by an Indenture, and an escrow and disbursement agreement with United States Trust Company of New York ("U.S. Trust"). The Indenture required Epic to pay the bondholders semi-annual (June and December) interest payments of $8.45 million until the bonds matured in 2005. The Indenture also mandated that Epic file with the SEC audited financial statements, an annual report, and an independent auditor's report. Epic also had to obtain a "negative assurance" statement[3] from its auditor, confirming Epic's compliance with the Indenture.

The Indenture named U.S. Trust as trustee for the bonds, and the escrow and disbursement agreement named U.S.

---

1. A timeline of transactions is appended.

2. High yield, below investment grade bonds are sometimes referred to as "junk bonds." 6A William Meade Fletcher, Fletcher Cyclopedia of the Law Of Private Corporations § 2649.20 (perm. ed., rev. vol. 2005) (footnotes omitted) (noting that often junk bonds refer to "subordinated debentures of corporations that do not have a very high credit rating and are required to pay above market interest rates for loans"); 5 Louis Loss & Joel Seligman, Securities Regulation (3d ed. 2001) (footnotes omitted) (defining junk bonds as "[h]igh yield, high risk, unrated or low rated bonds issued privately (largely to institutional investors eager for high returns) by a tender offeror to finance an offer, or by management

or third parties to finance a 'leveraged buyout' ").

3. The Indenture defined the negative assurance statement as:

a written statement of (x) the Issuer's independent public accountants (who shall be a firm of established national reputation) that in making the examination necessary for certification of such financial statements nothing has come to their attention which would lead them to believe that a Default or an Event of Default has occurred or, if any such Default or Event of Default has occurred, specifying the nature and period of existence thereof. . . .

Trust as escrow agent. Epic agreed to open an escrow account with U.S. Trust, from the bond proceeds, at an initial amount of $16.9 million. At all times thereafter, for the bondholders' security, Epic was required to maintain in the account "funds sufficient to make the next required interest payment"—$8.45 million. Failure to maintain this minimum escrow balance for more than sixty days after receiving notice from U.S. Trust constituted an event of default under the Indenture. The account was to have been established in U.S. Trust's name, and required that "all funds accepted by [U.S. Trust] pursuant to this Agreement shall be held for [U.S. Trust] for the benefit of [U.S. Trust] and the holders of the Notes."

Shortly after Epic issued the bonds, Prospect—one of the four Funds here— made three bond purchases. Epic made the requisite interest payments to its bondholders in June and December 1999. Subsequently, in March 2000, Epic retained Grant Thornton, LLP to audit its 1999 financial statements and to review its statements for the first three quarters of 2000. Grant Thornton discovered that Epic had opened a U.S. Trust cash management account, instead of the stipulated escrow account, and that the balance fell short of the required minimum. Despite these discrepancies, Grant Thornton issued a report in April 2000 that confirmed Epic's continued compliance with the escrow requirement.[4] The financial statement showed $12,004,000 cash in escrow, and Note F stated that "[t]he Company maintains [$8.45 million] at all times in escrow to cover the next required interest payment." According to Grant Thornton's partner-in-charge, Epic told Grant Thornton that U.S. Trust allowed Epic to use more than one account (the U.S. Trust account plus a PNC account) to meet its responsibilities under the Indenture and Escrow agreement; that the combined balance of those accounts was never less than $12 million; that U.S. Trust had never objected to the absence of funds in the U.S. Trust account; and that Epic periodically transferred funds to U.S. Trust to make the interest payment.

In early 2000, Highland Capital Management assumed the management of Prospect's portfolio. Highland has more than $1 billion in assets under management, with below investment grade bonds comprising about 90% of its portfolio. Davis Deadman, Highland's senior portfolio manager, was responsible for the Funds' investments in Epic and made all purchasing decisions for them. In December 2000, Cayman (another one of the Funds) bought Epic bonds, and Epic timely made its December interest payment. Around that time, Epic's primary lender, Prudential (which loaned Epic $2 million per week against its receivables), told Epic that it would not be renewing its credit arrangement. According to Epic's president, the credit relationship with Prudential was critical to Epic's existence and its ability to satisfy its obligations to bondholders, and Prudential's failure to renew the loan would "devastat[e]" Epic. Deadman learned (early in the first quarter of 2001) of Prudential's non-renewal but continued to buy bonds anyway, significantly increasing the Funds' holdings of Epic debt.

---

**4.** The "Report of Independent Certified Public Accountants" issued by Grant Thornton included the following:

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Epic Resorts, LLC as of December 31, 1999, and the results of its operations and its cash flows for the year ended December 31, 1999, in conformity with auditing standards generally accepted in the United States.

On April 17, 2001, Grant Thornton issued its 2000 report, which again showed over $12 million cash in escrow, and again confirmed that "[t]he Company maintains [$8.45 million] at all times in escrow to cover the next required interest payment." On June 15, 2001, Epic missed its scheduled interest payment to the bondholders. Epic's president testified that, although Epic could have made the payment, Prudential's failure to renew the credit arrangement required Epic to use the money to fund operations. Four days later, the Funds purchased more bonds and then took action to protect their investments. Because Epic's missed interest payment constituted an event of default under the Indenture, the Funds forced Epic into bankruptcy in July 2001. The Funds then sued Grant Thornton, alleging, among other things,[5] that the auditor's reports misrepresented the escrow account's status.[6] Nevertheless, the Funds—under Highlands' management—continued to buy Epic bonds in February 2002, in April 2002, and again in April 2003.[7]

The Funds alleged that Grant Thornton committed fraud, negligent misrepresentation, negligence, third-party-beneficiary breach of contract, conspiracy to commit fraud, and aiding and abetting fraud. They sought damages equal to the full face value of all the bonds they purchased, plus five years of interest payments (2001–2005). The trial court granted Grant Thornton's motion for summary judgment on all claims. The court of appeals affirmed the trial court's judgment on claims related to post-suit transactions, as well as on the breach of contract and negligence claims, but reversed on the negligent misrepresentation, fraud, conspiracy, and aiding and abetting claims. 203 S.W.3d 602 at 621–22.

On rehearing, we granted Grant Thornton's petition for review,[8] 51 Tex. Sup.Ct. J. 1186 (Aug. 29, 2008), which asserts (1) that there is no evidence of a causal connection between Grant Thornton's alleged misrepresentation and the Funds' alleged injury; (2) that there is no evidence of actual and justifiable reliance; and (3) that liability for fraudulent misrepresentation runs only to those whom the auditor knows and intends to influence at the time the report is issued—all of which Grant Thornton contends were absent in this case.[9]

The Funds allege several bases for their claims: that Grant Thornton's misrepresentations: (1) led them to purchase additional bonds; (2) dissuaded them from investigating whether the minimum balance was being maintained in the escrow account, which prevented them from forcing

---

5. The Funds also complained that Grant Thornton failed to properly account for pending debt maturities, verify related party transactions, and provide a going concern limitation on either of the audits it performed.

6. The Funds also sued Prudential Securities, Inc., Prudential Securities Credit Corp., LLC, and U.S. Trust. Those claims have been settled.

7. Counsel representing the Funds explained during oral argument that the Funds continued to buy bonds after the default in order to "reach a threshold of control for the bankruptcy" so that they could maximize their

value in bankruptcy proceedings, as well as to obtain "litigation rights."

8. The Funds have not challenged the court of appeals' judgment on the post-suit transactions, breach of contract, and negligence claims.

9. The Texas Society of Certified Public Accountants (TSCPA), American Institute of Certified Public Accountants (AICPA), and Texans for Lawsuit Reform submitted briefs of amici curiae in support of Grant Thornton's motion for rehearing; TSCPA and AICPA submitted additional briefs in support of Grant Thornton upon our grant of the motion for rehearing.

Epic into bankruptcy sooner; and (3) induced them to refrain from selling bonds (so-called "holder claims").

## II. Bond purchases

We turn first to the Funds' complaints that they would not have purchased Epic bonds had Grant Thornton disclosed the escrow irregularities.

### A. Scope of liability

One of the Funds, Cayman, bought bonds after Grant Thornton issued its 1999 audit report and before the Funds learned that Prudential would not renew Epic's credit facility. But Grant Thornton argues that Cayman, a potential investor, was not within its scope of liability when the audit report was published. To address this claim, we first examine the evolution of auditor liability law.

#### 1. Negligent misrepresentation

##### a. Auditor liability to third parties: an overview

For over seventy years, state courts have debated the contours of liability when an auditor's negligent misrepresentation injures a third party. *See generally,* Jay M. Feinman, *Liability of Accountants for Negligent Auditing: Doctrine, Policy, and Ideology,* 31 Fla. St. U.L.Rev. 17 (2003); Jodi B. Scherl, Comment, *Evolution of Auditor Liability to Noncontractual Third Parties: Balancing the Equities and Weighing the Consequences,* 44 Am. U.L.Rev. 255 (1994). For the first half of the twentieth century, the seminal case on auditor liability was Justice Cardozo's New York Court of Appeals opinion, *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931). In *Ultramares,* the court discussed what it termed "the assault upon the citadel of privity." *Ultramares,* 174 N.E. at 445. The court refused to extend negligence's foreseeability principle to eco-

nomic losses caused by an auditor's lapse, absent a bond "so close as to approach that of privity." *Id.* at 446. The court coined a phrase that would echo through succeeding opinions nationwide: "If liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Id.* at 444.

Over the ensuing decades, however, courts began to stray from *Ultramares* and expand auditors' scope of liability. These cases fall along a spectrum, with *Ultramares* on one end (requiring privity, or near-privity), and a handful of cases on the other (holding that mere foreseeability suffices to establish liability). The leading case in the latter camp is from New Jersey, *H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 461 A.2d 138 (1983). Likening a negligent audit to a defective product, the court held that "the reasonably foreseeable consequences of the negligent act define the duty and should be actionable." *Rosenblum,* 461 A.2d at 145. Few states have adopted this approach, and *Rosenblum* itself was superseded by a 1994 statute replacing it with a near-privity standard, N.J. Stat. Ann. § 2A:53A–25. *See, e.g., Touche Ross & Co. v. Commercial Union Ins. Co.,* 514 So.2d 315, 322 (Miss. 1987); *Citizens State Bank v. Timm, Schmidt & Co.,* 113 Wis.2d 376, 335 N.W.2d 361, 366 (1983).

New York and other states have drifted only cautiously from *Ultramares's* strict standard, adopting a near-privity predicate to auditor liability. The leading case behind this model is *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985). *Credit Alliance* applied a three-part inquiry to determine whether an auditor and a

third party have sufficient privity to implicate liability, namely: "a particular purpose for the accountants' report, a known relying party, and some conduct on the part of the accountants linking them to that party." *Id.*, 493 N.Y.S.2d 435, 483 N.E.2d at 119. In applying this test, the court held that even though the auditor was aware that the third party would receive the report, it was not liable because there was "no allegation that [the auditor] had any direct dealings with plaintiffs, had specifically agreed ... to prepare the report for plaintiffs' use or according to plaintiffs' requirements, or had specifically agreed ... to provide plaintiffs with a copy or actually did so." *Id.* The high courts in Maryland, Montana, and Idaho have explicitly adopted *Credit Alliance's* reasoning. *See Idaho Bank & Trust Co. v. First Bancorp of Idaho*, 115 Idaho 1082, 772 P.2d 720, 722 (1989); *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 762 A.2d 582, 607 (2000); *Thayer v. Hicks*, 243 Mont. 138, 793 P.2d 784, 789 (1990).

The American Law Institute's 1977 Restatement (Second) of Torts included a section on "Information Negligently Supplied for the Guidance of Others." RESTATEMENT (SECOND) OF TORTS § 552. Section 552 offers a middle-ground approach to third-party auditor liability, providing that:

[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.... [T]he liability stated ... is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

*Id.*

Of the various approaches taken by states, most have embraced the Restatement's formulation. *See* Feinman, 31 FLA. ST. U.L.REV. at 41 n. 165. Although the Restatement has been criticized,[10] it provides a window through which direct victims of auditor negligence can demand accountability without unleashing potentially unlimited auditor liability. The most thorough exponent of the Restatement's construct can be found in a 1992 case from the Supreme Court of California, *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 11 Cal. Rptr.2d 51, 834 P.2d 745 (1992). After surveying the waterfront of auditor liabili-

**10.** The Supreme Court of California, in *Bily v. Arthur Young & Co.*, noted Dean William L. Prosser's (Reporter for the Restatement) apologetic remark regarding the uncertainty inherent in the Restatement's language:

The problem is to find language which will eliminate liability to the very large class of persons whom almost any negligently given information may foreseeably reach and influence, and limit the liability, not to a particular plaintiff defined in advance, but

to the comparatively small group whom the defendant expects and intends to influence. Neither the Reporter, nor, it is believed, the Advisers nor the Council, is entirely satisfied with the language of Subsection (2); and if anyone can do better, it will be most welcome.

*Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 11 Cal.Rptr.2d 51, 834 P.2d 745, 759 (1992) (citing RESTATEMENT (SECOND) OF TORTS § 552 (Tentative Draft No. 11, 1965)).

ty to third persons, the *Bily* court concluded that the Restatement approach:

> is most consistent with the elements and policy foundations of the tort of negligent misrepresentation. The rule expressed there attempts to define a narrow and circumscribed class of persons to whom or for whom representations are made. In this way, it recognizes commercial realities by avoiding both unlimited and uncertain liability for economic losses in cases of professional mistake and exoneration of the auditor in situations where it clearly intended to undertake the responsibility of influencing particular business transactions involving third persons.

*Id.*, 11 Cal.Rptr.2d 51, 834 P.2d at 769.

For nearly two decades, we have similarly embraced the Restatement approach. *See McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 791 (Tex.1999); *see also Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991). In *McCamish*, we examined whether the absence of an attorney-client relationship precluded a third party from suing an attorney for negligent misrepresentation under Restatement section 552. *McCamish*, 991 S.W.2d at 788. We held that, under certain circumstances, section 552 causes of action can be brought by third parties against attorneys, just as they have been legitimately brought against auditors, accountants, and other professionals. *Id.* at 791.

We explained that "a section 552 cause of action is available only when information is transferred by an attorney to a *known* party for a *known* purpose." *Id.* at 794 (emphasis added). Under section 552, a "known party" is one who falls in a limited class of potential claimants, "'for whose benefit and guidance [one] intends to supply the information or knows that the recipient intends to supply it.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 552(2)(a)). This formulation limits liability to situations in which the professional who provides the information is "aware of the nonclient and intends that the nonclient rely on the information." *Id.* Unless a plaintiff falls within this scope of liability, a defendant cannot be found liable for negligent misrepresentation.

*McCamish* has served as a guidepost for our courts of appeals in analyzing the tort of negligent misrepresentation,[11] in contrast to earlier decisions applying a broader standard.[12] We reaffirm today that *McCamish* represents Texas law under section 552 of the Restatement.

### b. Was Cayman within a limited class?

■ Cayman bought bonds in December 2000, allegedly in reliance on the 1999

---

**11.** *See, e.g., Ervin v. Mann Frankfort Stein & Lipp CPAs, LLP*, 234 S.W.3d 172, 177 (Tex. App.-San Antonio 2007, no pet.) (restating the rule in *McCamish*: "In other words, standing exists when the professional has knowledge of the identity of the party to whom the information is provided and actual knowledge of the purpose for which the information is being supplied."); *Abrams Ctr. Nat'l Bank v. Farmer, Fuqua & Huff, P.C.*, 225 S.W.3d 171, 177 (Tex.App.-El Paso 2005, no pet.) ("Following *McCamish*, the Dallas Court of Appeals recognized the Restatement's requirement of actual knowledge."); *Tara Capital Partners I, L.P. v. Deloitte & Touche, L.L.P.*, No. 05–03–00746–

CV, 2004 WL 1119947, at *2, 2004 Tex.App. LEXIS 4577, at *6 (Tex.App.-Dallas May 20, 2004, pet. denied); *see also Compass Bank v. King, Griffin & Adamson P.C.*, 388 F.3d 504, 505 (5th Cir.2004) ("[W]e are persuaded that the Restatement's actual knowledge standard applies to accountants in Texas.").

**12.** *See Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.*, 715 S.W.2d 408, 413 (Tex.App.-Dallas 1986, writ ref'd n.r.e.) (imposing liability if an auditor knows or "should know" that such statements will be relied upon).

audit report, issued in April 2000. Grant Thornton contends that Cayman, which had never before purchased Epic bonds, was indistinguishable from any other unknown potential investor, and thus outside Grant Thornton's "scope of liability." Cayman counters that it falls within a limited class because few investors actually purchase high yield debt like the bonds at issue here. We find Cayman's argument unpersuasive. Epic's bonds were sold on the open market: that only certain investors bought them does not make those investors a "limited group." As the United States Court of Appeals for the Fifth Circuit has explained, "to interpret the 'limited group' requirement as including all potential investors would render that requirement meaningless." *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.*, 81 F.3d 606, 613 (5th Cir.1996) (applying Texas law).[13] Like the Fifth Circuit, "we do not suggest that a potential purchaser can never be a member of a 'limited group,'" but the facts here do not support such a determination. *See Scottish Heritable Trust*, 81 F.3d at 614 (noting that potential investor with "no previous connection to either the corporation or the accountant" was not within such a group). Cayman had no prior connection to Epic or Grant Thornton, and predicating scope of liability on Grant Thornton's general knowledge that investors may purchase Epic bonds would "eviscerate the Restatement rule in favor of a de facto foreseeability approach—an approach [we] have refused to embrace." *See id.*

The court of appeals in this case held that a fact issue precluded summary judgment on the limited class issue because "appellants already owned Epic bonds" and "were not merely members of a large universe of potential investors." 203 S.W.3d at 615–16 (noting that authorities suggest that existing investors may fall within limited class). While this may have been true as to some of the Funds, it was not the case for Cayman, which did not buy bonds until December 2000. Because Cayman was not within a "limited group" when it bought bonds in December 2000, it was outside Grant Thornton's scope of liability. *See McCamish*, 991 S.W.2d at 794.

### 2. Fraud—scope of liability

Although similar in their essential elements, fraud is more difficult to prove than negligent misrepresentation "due to the added element of intent to deceive." *Richter, S.A. v. Bank of America Nat'l Trust & Sav. Ass'n*, 939 F.2d 1176, 1185 (5th Cir.1991) (applying Texas law); *see also Perenco Nig. Ltd. v. Ashland Inc.*, 242 F.3d 299, 306 (5th Cir.2001) (applying Texas law).

In *Ernst & Young v. Pacific Mutual*, we confirmed the intent standard for fraud under section 531 of the Restatement (Sec-

---

**13.** *See also In re ML–Lee Acquisition Fund II, L.P.* 848 F.Supp. 527, 556 (D.Del.1994) (dismissing negligent misrepresentation claim because plaintiffs alleged inducement based only on publicly disseminated documents); *In re Crazy Eddie Sec. Litig.*, 812 F.Supp. 338, 360 (E.D.N.Y.1993) (applying Texas law and noting "the court cannot find a single decision by any court extending an accountant's duty of care to as-yet unidentified future open-market buyers of publicly-traded securities, even when that duty is limited to the rarified class of buyers with sufficient resources to acquire control of entire companies. This court believes that the Texas Supreme Court is unlikely to adopt a rule so universally avoided by sister states.") (citation omitted); *see also First Nat'l Bank of Commerce v. Monco Agency, Inc.*, 911 F.2d 1053, 1062 (5th Cir.1990) (holding that, under Restatement approach, actual knowledge was required; "[a]nything less ... would extend liability to the bounds of 'reasonable foreseeability'" and affirming summary judgment for accountants on that basis).

ond) of Torts,[14] as a party's "reason to expect" that its representations will affect other parties' conduct. *Ernst & Young, L.L.P. v. Pacific Mutual Life Ins. Co.,* 51 S.W.3d 573, 575 (Tex.2001). In that case, Pacific Mutual bought notes issued by InterFirst. *Id.* Pacific Mutual later sued Ernst & Young, an accounting firm, for releasing audit reports that allegedly misrepresented the financial strength of a company that merged with InterFirst. *Id.* Seeking to prove that Ernst & Young knew that third-party investors would rely on the audit reports, Pacific Mutual produced affidavits stating that "it is a commonly known and accepted practice in the financial industry for investors ... to rely on representations" like those made by Ernst & Young. *Id.* at 576. The court of appeals held that these affidavits alone presented a fact issue as to whether the auditor had "reason to expect" that institutional investors would rely on its representations. *Id.* at 577.

We rejected that view, holding that "the reason-to-expect standard requires more than mere foreseeability; the claimant's reliance must be 'especially likely' and justifiable, and the transaction sued upon must be the type the defendant contemplated." *Id.* at 580. We observed that the evidence referred to "what is commonly 'known' or 'expected' in the investment community," but we noted that "even an obvious risk that a third person will rely on a representation is not enough to impose liability. General industry practice or knowledge may establish a basis for foreseeability to show negligence, but it is not probative of fraudulent intent." *Id.* at 581 (citation omitted). We held that the trial court properly granted summary

judgment to the accounting firm, which had no relationship with the investors and no special reason to expect the investors' reliance on the audit report. *Id.* at 583.

██ In this case, the court of appeals held that there was a "fact issue regarding whether Grant Thornton had reason to expect that it was especially likely that [the Funds] would receive and rely upon Epic's audited financial statements." 203 S.W.3d at 612. The court based its determination on the Indenture's reference to Epic securityholders. *Id.* (noting that "the Indenture provides Epic 'shall file with the Commission and shall furnish to the Trustee and each Securityholder ... copies of the quarterly and annual reports and of the information, documents, and other reports ...'"). Even if this provision suggested that Grant Thornton may have been aware of *existing* bondholders as a limited class, a question we need not reach, it does not meet the requisite standard as to prospective purchasers, like Cayman, who claim to have relied on the 1999 audit report. Cayman's claim is like the one we rejected in *Pacific Mutual,* and it fails for the same reasons.

### B. Reliance

In 2001, several of the Funds—both existing and prospective bondholders—bought Epic bonds. The parties hotly dispute whether existing bondholders are within Grant Thornton's scope of liability. We need not resolve that disagreement, however, as we conclude that there was no evidence that those Funds justifiably relied on the audit reports or the negative assurance statement.

**14.** One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which intends or has reason to expect their conduct to be influenced.
Restatement (Second) Of Torts § 531.

**1. The Funds could not have justifiably relied on the audit reports after learning of Prudential's failure to renew Epic's credit facility.**

■ Both fraud and negligent misrepresentation require that the plaintiff show actual and justifiable reliance. *Pacific Mutual,* 51 S.W.3d at 577; *Fed. Land Bank Ass'n v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991). In measuring justifiability, we must inquire whether, "given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part." [15] *Haralson v. E.F. Hutton Group, Inc.,* 919 F.2d 1014, 1026 (5th Cir.1990) (applying Texas law). Moreover, "a person may not justifiably rely on a representation if 'there are "red flags" indicating such reliance is unwarranted.'" *Lewis v. Bank of Am. N.A,* 343 F.3d 540, 546 (5th Cir.2003) (holding that plaintiff's decision to enter into transaction without undertaking additional investigation into tax consequences was not justifiable, given his access to professional accountants, the amount of money involved, and the ambiguous nature of the pertinent representation) (quoting *In re Mercer,* 246 F.3d 391, 418 (5th Cir.2001)).

■ Accordingly, we must examine the timing of the relevant purchases. Obviously, bonds purchased before Epic hired Grant Thornton in March 2000 could not have been bought in reliance on the audit reports.[16] With respect to bonds purchased (by Pam Capital, Pamco, Prospect, and Cayman) after Deadman learned that Prudential would not renew Epic's credit arrangement, however, we agree with Grant Thornton that such reliance was unjustifiable. Deadman, an experienced bond investor with a bachelor's degree in finance and a masters in business administration, testified that Prudential's $2 million-per-week credit facility "really was the lifeblood of the company." Without it, "the company would have to shut down or replace it." Nonetheless, knowing that Epic had lost its primary source of funding, the Funds continued to buy bonds in April, May, and June—even after Epic failed to make its scheduled June 15 interest payment.[17] Deadman purchased these bonds at prices ranging from 23.5% to 30.25% of par value—prices that, Deadman admitted, reflected a substantial risk that

---

15. There is authority suggesting that fraud and negligent misrepresentation claims require different thresholds of justifiability, with it being more difficult to prove in the negligent misrepresentation context. *See, e.g., Haralson v. E.F. Hutton Group, Inc.,* 919 F.2d 1014, 1026 n. 5 (5th Cir.1990) (noting that when "an intentional tort like fraud is not at issue, courts more readily equate unjustifiable reliance in a negligent misrepresentation context with contributory negligence"). Assuming without deciding that a different standard applies, the Funds' lack of justifiable reliance for their fraud claim necessarily bars their negligent misrepresentation claim as well. *See id.* (noting that "a finding of unjustifiable reliance on fraudulent conduct for common law fraud purposes precludes a negligent misrepresentation claim based on the same conduct").

16. Those Funds assert holder claims, discussed more fully below.

17. Two additional funds (Highland Crusader and PCMG) continued buying bonds even after forcing Epic into bankruptcy and suing Grant Thornton for auditing deficiencies. Those purchases, however, are not at issue here. The court of appeals' affirmed the trial court's summary judgment as to those transactions, and the Funds have not challenged that decision. 203 S.W.3d at 614 (holding that the Funds' reliance was not justifiable because "Deadman was undeterred from buying Epic bonds, at fire sale prices, despite having full knowledge of the problems with the audits").

the bonds would not be redeemed for face value. If these Funds relied on the 1999 or 2000 audit reports in making the 2001 purchases, that reliance would not have been justifiable in light of the Funds' knowledge that Prudential had cut off Epic's "lifeblood."

### 2. There is no evidence the Funds relied on the 1999 negative assurance statement.

■ Nor is there evidence that the Funds relied on the 1999 negative assurance statement. The statement verified that "in making the examination necessary for certification of such financial statements nothing has come to [Grant Thornton's] attention which would lead [it] to believe that the Issuers have violated any provisions of Article 4, 5 or 6 of this Indenture insofar as they relate to accounting matters or, if any such violation has occurred, specifying the nature and period of existence thereof, it being understood that such accountants shall not be liable to any Person for any failure to obtain knowledge of any such violation...." Grant Thornton provided the statement to Epic in April 2000, but the statement was not part of Epic's public filing.

It is undisputed that the Funds never received or reviewed the statement. Nevertheless, the Funds contend that because U.S. Trust, their escrow agent and trustee, received and relied upon that statement, then the Funds, in effect, relied on the statement by proxy. Grant Thornton contends that, until the court of appeals' decision in this case, Texas courts have never recognized such a "vicarious reliance" theory. Regardless, Grant Thornton argues, if U.S. Trust's reliance is to be imputed to the Funds, so too should U.S. Trust's knowledge of the escrow account irregularities. We agree with Grant Thornton.

Although an agent's knowledge is generally imputed to its principal, the court of appeals declined to do so because U.S. Trust was an escrow agent and owed fiduciary duties to both the Funds and to Epic. Accordingly, the court held that Grant Thornton had not proved as a matter of law that imputation of U.S. Trust's knowledge was appropriate. 203 S.W.3d at 617 (noting that "Grant Thornton's authorities all involve agents operating for a single principal"). But when, as here, there is a dual agent, operating with the consent and knowledge of both principals, the agent's knowledge is imputed to its principals.[18]

---

18. See, e.g., Bradford v. McElroy, 746 S.W.2d 294, 296 (Tex.App.-Austin 1988, no writ); United States Fidelity & Guar. Co. v. San Diego State Bank, 155 S.W.2d 411, 413 (Tex.Civ. App.-El Paso 1941, writ ref'd w.o.m.) (noting that, principals who share a "common agent," acting with their knowledge and consent, will be charged with the agent's knowledge, in the absence of fraud); see also Harydzak v. New Horizon, LLC, 406 B.R. 499, 514 (Bankr.S.D.Tex.2009) (holding that escrow agent's knowledge could be imputed to its principals); Manley v. Ticor Title Ins. Co., 168 Ariz. 568, 816 P.2d 225, 230 (1991) ("The knowledge of a dual agent is normally imputed to both principals."); Triple A Management Co. v. Frisone, 69 Cal.App.4th 520, 81 Cal. Rptr.2d 669, 678 (1999) (observing that " '[a]s a dual agent for both parties, the knowledge of the escrow agent regarding matters within the same escrow is imputed to both parties to the escrow' " (quoting 3 MILLER & STAR, CAL. REAL ESTATE § § 8.56, 8.61 (2d ed. 1989))); Carlton v. Moultrie Banking Co., 170 Ga. 185, 152 S.E. 215, 219–20 (1930) (holding that the knowledge of a dual agent is imputable to both principals); Messall v. Merlands Club, Inc., 233 Md. 29, 194 A.2d 793, 797 (1963) (observing that "a depositary can be an agent for both parties to an escrow agreement" and "the knowledge of an agent acquired in the course of its agency is imputable to its principals"); Thomas v. Jarecki, 109 Neb. 549, 191 N.W. 669, 670 (1922) (holding that knowledge of a dual agent is imputed to and binds the principal to whom such notice or knowledge would be imputed if the agent represented him alone); Newsom v. Watson, 198 Okla.

Sirojni Dindial, U.S. Trust's officer in charge of the Epic account, testified that she was unaware of the escrow agreement and did not know that it appointed U.S. Trust as the escrow agent. The court of appeals held that this created a fact issue regarding U.S. Trust's knowledge of its role as escrow agent. *Id.* at 618. We disagree. U.S. Trust was a party to the escrow agreement: that a U.S. Trust employee was unaware of its existence does not create a fact issue as to the company's knowledge of its contract. *Duncan v. Robertson,* 129 Tex. 637, 105 S.W.2d 214, 216 (1937) (holding that " 'in the absence of fraud or imposition, a party to a contract, which has been voluntarily signed and executed by him, with full opportunity for information as to its contents, cannot avoid it on the ground of his own negligence or omission to read it' " (quoting *Indem. Ins. Co. v. Macatee & Sons,* 129 Tex. 166, 101 S.W.2d 553, 557 (1937))).

Finally, the court of appeals held that there was a fact issue regarding whether U.S. Trust was acting adversely to the Funds, precluding imputation of its knowledge to the Funds. 203 S.W.3d at 618 (noting that "an agent's knowledge is not imputed to its principal if the agent has an adverse interest in not revealing it"). Grant Thornton argues that there is no evidence that U.S. Trust's interests were adverse to the Funds' interests at all, much less that U.S. Trust was concerned only for itself. *See Goldstein v. Union Nat'l Bank,* 109 Tex. 555, 213 S.W. 584, 590–91 (1919) (holding that rule of imputation applies unless "the agent's interests are so incompatible with the interests of his principal as practically to destroy the agency or to render it reasonably proba-

ble" that agent will not act on his acquired knowledge nor disclose it to his principal). But even assuming the adverse interest exception applied, the Funds would not be able to claim U.S. Trust's reliance as their own while simultaneously asserting that its knowledge should not bind them. *See id.* at 591 (noting that " 'when a principal has consummated a transaction in whole or in part through an agent, it is contrary to equity and good conscience that he should be permitted to avail himself of the benefits of his agent's participation without becoming responsible as well for his agent's knowledge as for his agent's act' ") (quoting *Irvine v. Grady,* 85 Tex. 120, 19 S.W. 1028, 1029 (1892)). As one court has observed, in such situations:

> [T]he principal is impaled on the horns of a dilemma. If he disclaims the agent's act as unauthorized, he has no grounds to retain the fruits thereof; on the other hand, if he retains the fruits of the agent's act, after knowledge of the facts, he must in fairness be charged with the agent's knowledge.

*Great American Indemnity Co. v. First Nat. Bank of Holdenville,* 100 F.2d 763, 765 (10th Cir.1938); *see also* 2 FLOYD R. MECHEM, A TREATISE ON THE LAW OF AGENCY § 1826, at 1412 (2d ed. 1914) ("[W]here the agent is the sole representative of the corporation, the corporation can not [sic] claim anything except through him and that therefore if it claims through him, after notice of the facts, it must accept his agency with its attendant notice.").

The Funds do not allege—nor is there any evidence—that Grant Thornton colluded with U.S. Trust to defraud the Funds, such that the general rule of imputation

220, 177 P.2d 109, 111 (1947) (" 'Where a principal knows that his agent is also acting for the party adversely interested in the transaction, and yet consents to let him act as his agent, the principal is estopped from denying

notice and knowledge which the agent has during the negotiation.' " (quoting 3 C.J.S. AGENCY § 271)); *American Nat'l Bank of Powell v. Foodbasket,* 497 P.2d 546, 547–48 (Wyo. 1972).

would not apply. *See Ft. Worth v. Pippen,* 439 S.W.2d 660, 665 (Tex.1969); *see also FDIC v. Shrader & York,* 991 F.2d 216, 225 (5th Cir.1993). In fact, they argue quite the opposite: they repeatedly refer to U.S. Trust as "a representative of the Funds," and they assert that "U.S. Trust was relying on Grant Thornton to determine whether . . . the Indenture had been violated." The Funds submitted testimony from U.S. Trust representatives, who stated that "[U.S. Trust] relied on Epic's independent public accountants for this certification. . . . Had these accountants indicated that something had 'come to their attention which would lead them to believe that the issuers have violated any provisions of Articles 4, 5, or 6 of the Indenture,' [U.S. Trust] would have taken whatever steps may have been required under the Indenture."

Because the Funds may not substitute U.S. Trust's reliance for their own without also inheriting its knowledge, its claims based on the 1999 negative assurance statement fail. *See Irvine,* 19 S.W. at 1030 (observing that "it is inequitable for the principal to avail himself of the agent's acts without being held to know what the agent knows").

## III. Holder claims

Finally, we turn to the Funds' "holder claims," in which they contend not that Grant Thornton's misrepresentations induced them to *take* action, but rather that they induced them to *refrain* from doing so: the Funds allege that, but for Grant Thornton's representations, they would have sold their bonds sooner, when doing so would have been more profitable, or they would have forced Epic into bankruptcy sooner, when it had more assets to liquidate. The Funds urge the Court to consider the propriety of such claims, citing a Texas appellate decision, later withdrawn, *Shirvanian v. DeFrates,* No. 14–02–00447–CV, 2004 WL 35987, 2004 Tex. App. LEXIS 182, at *53–*59 (Tex.App.-Houston [14th Dist.] Jan. 8, 2004) (holding that forbearance from selling stock, in reliance on direct communications made for the purpose of preventing plaintiffs from selling their stock, could form the basis of a cause of action for fraud under Texas law), *opinion withdrawn and substituted by Shirvanian v. DeFrates,* 161 S.W.3d 102 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). We have never before considered the issue.

In a "holder" claim, the plaintiff alleges not that the defendant wrongfully induced the plaintiff to purchase or sell stock, but that the defendant wrongfully induced the plaintiff to continue holding his stock. As a result, the plaintiff seeks damages for the diminished value of the stock, or the value of a forfeited opportunity, allegedly caused by the defendant's misrepresentations. *Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.),* 490 F.Supp.2d 784, 787 n. 4 (S.D.Tex. 2007); *Small v. Fritz Cos., Inc.,* 30 Cal.4th 167, 132 Cal.Rptr.2d 490, 65 P.3d 1255, 1262–63 (2003). The U.S. Supreme Court has refused to recognize holder claims under federal securities law, primarily due to their speculative nature and difficulties in proof. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 734–735, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The Court observed that "a putative plaintiff, who neither purchases nor sells securities but sues instead for intangible economic injury such as loss of a noncontractual opportunity to buy or sell, is more likely to be seeking a largely conjectural and speculative recovery. . . ." *Id.* As the Court explained:

> The manner in which the defendant's violation caused the plaintiff to fail to act could be as a result of the reading of a prospectus, as respondent claims

here, but it could just as easily come as a result of a claimed reading of information contained in the financial pages of a local newspaper. Plaintiff's proof would not be that he purchased or sold stock, a fact which would be capable of documentary verification in most situations, but instead that he decided *not* to purchase or sell stock. Plaintiff's entire testimony could be dependent upon uncorroborated oral evidence of many of the crucial elements of his claim, and still be sufficient to go to the jury. The jury would not even have the benefit of weighing the plaintiff's version against the defendant's version, since the elements to which the plaintiff would testify would be in many cases totally unknown and unknowable to the defendant. The very real risk in permitting those in respondent's position to sue under Rule 10b–5 is that the door will be open to recovery of substantial damages on the part of one who offers only his own testimony to prove that he ever consulted a prospectus of the issuer, that he paid any attention to it, or that the representations contained in it damaged him.

*Blue Chip Stamps,* 421 U.S. at 746, 95 S.Ct. 1917. The Supreme Court concluded that holder claims were impermissible in federal Rule 10b–5 actions, recognizing that its holding might be viewed as "an arbitrary restriction which unreasonably prevents some deserving plaintiffs from recovering damages which have in fact been caused by violations of Rule 10b–5." *Id.* at 738, 95 S.Ct. 1917. That disadvantage, however, was "attenuated to the extent that remedies are available to nonpur-

chasers and nonsellers under state law." [19] *Id.* at 739 n. 9, 95 S.Ct. 1917.

And yet, a number of courts have rejected such claims. *See Crocker v. FDIC,* 826 F.2d 347, 351 (5th Cir.1987) (finding that an alleged "lost profit opportunity" under Mississippi law was "too speculative to state any injury … apart from a diminution in the value of [ ] stock"; claim could not, therefore, be brought as a nonderivative claim); *Newby,* 490 F.Supp.2d at 803 (guessing that this Court would not recognize holder claims or, if it did, would do so only if heightened pleading standards were satisfied); *WM High Yield Fund v. O'Hanlon,* No. 04–3423, 2005 WL 1017811, at *12–*13, 2005 U.S. Dist. LEXIS 33569, at *41–*42 (E.D.Pa. Apr. 29, 2005) (predicting that the Pennsylvania Supreme Court would not recognize holder claims); *Arnlund v. Deloitte & Touche LLP,* 199 F.Supp.2d 461, 489–90 (E.D.Va.2002); *Chanoff v. U.S. Surgical Corp.,* 857 F.Supp. 1011, 1019 (D.Conn.1994) (holding that state law claims for damages based on failure to sell or hedge stock are "too speculative to be actionable"), *aff'd,* 31 F.3d 66 (2d Cir.1994); *Dloogatch v. Brincat,* 396 Ill.App.3d 842, 336 Ill.Dec. 571, 920 N.E.2d 1161, 1168–69 (2009) (dismissing holder claim because plaintiffs failed to plead reliance with sufficient specificity and did not show that they suffered a compensable loss); *cf. Holmes v. Grubman,* 286 Ga. 636, 691 S.E.2d 196, 199 (2010) ("In many of the decisions on which Appellees rely, holder claims were not categorically rejected, but the plaintiffs failed to allege or prove that they specifically desired to sell their stock at a certain time,

**19.** We note that state law holder class actions are now preempted by the Securities Litigation Uniform Standards Act of 1998. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,* 547 U.S. 71, 87–88, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006). Individual holder claims, however, remain state law actions. *See In re Countrywide Corp. S'holders Litig.,* No. 34–64–VCN, 2009 WL 846019, at *5 n. 26, 2009 Del. Ch. LEXIS 44, at *20 n. 26 (Del.Ch. Mar. 31, 2009).

or causation was not sufficiently alleged or proved.").

Conversely, courts in several states (including California,[20] Massachusetts,[21] New Jersey,[22] and New York[23]) have recognized holder claims. Those decisions generally observe that fraud does not cease being so when it induces a party to refrain from acting. *See, e.g., Gutman v. Howard Sav. Bank,* 748 F.Supp. 254, 264 (D.N.J. 1990) ("Lies which deceive and injure do not become innocent merely because the deceived continue to do something rather than begin to do something else."). Because "[i]nducement is the substance of reliance[,] the form of reliance—action or inaction—is not critical to the actionability of fraud." *Id.* The Restatement (Second) of Torts is in accord. RESTATEMENT (SECOND) OF TORTS § 525 ("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act *or to refrain from action* in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.") (emphasis added); *see also id.* §§ 531, 551. Most recently, the Georgia Supreme Court, on certified question from the Sec-

ond Circuit Court of Appeals, held that holder claims were cognizable under Georgia law. *Holmes,* 691 S.E.2d at 200.

But even those courts that have recognized holder claims in some form generally have demanded that plaintiffs meet heightened pleading and proof standards. *See id.* (holding that "although we have determined that holder claims should be recognized under Georgia law, we further conclude that the limitations imposed in other jurisdictions are appropriate"); *see also Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & "ERISA" Litig.),* No. MDL–1446, 2007 WL 789141 at \*11, 2007 U.S. Dist. LEXIS 17374 at \*45–\*46 (S.D.Tex. Mar. 12, 2007); *Rogers v. Cisco Sys.,* 268 F.Supp.2d 1305, 1314 (N.D.Fla. 2003) (guessing that Florida courts would recognize holder claims but would require "the specificity in allegations of reliance recently recognized by the Supreme Court of California's [*Small v. Fritz Cos.*] decision"). Some require more exacting allegations and evidence of reliance,[24] while others require a showing that parties held onto securities as a result of information they received through some direct communication with the defendants.[25]

**20.** *Small v. Fritz Cos.,* 30 Cal.4th 167, 132 Cal.Rptr.2d 490, 65 P.3d 1255, 1264 (2003).

**21.** *David v. Belmont,* 291 Mass. 450, 197 N.E. 83, 85 (1935).

**22.** *Gutman v. Howard Sav. Bank,* 748 F.Supp. 254, 264 (D.N.J.1990).

**23.** *The Cont'l Ins. Co. v. Mercadante,* 222 A.D. 181, 225 N.Y.S. 488, 491 (1927).

**24.** *See Rogers,* 268 F.Supp.2d at 1314 (dismissing holder claims under Florida law because plaintiffs failed to allege how many shares they would have sold and when they would have sold them); *Small,* 132 Cal. Rptr.2d 490, 65 P.3d at 1265 (requiring holder plaintiffs to allege specific reliance, "for example, that if the plaintiff had read a truth-

ful account of the corporation's financial status the plaintiff would have sold the stock, how many shares the plaintiff would have sold, and when the sale would have taken place" and requiring allegations of "actions, as distinguished from unspoken and unrecorded thoughts and decisions").

**25.** *See Gutman,* 748 F.Supp. at 266 (allowing holder claim to proceed because claim involved "direct dealings with defendants in which the latter made certain of the representations complained of"); *N.Y. City Employees' Ret. Sys. v. Ebbers (In re WorldCom, Inc. Sec. Litig.),* 382 F.Supp.2d 549, 559–60 (S.D.N.Y. 2005) (predicting that New York would recognize a holder claim where plaintiff pleads specific direct communication with defendant to show actual reliance); *Goldin v. Salomon Smith Barney, Inc.,* 994 So.2d 517, 520 (Fla.

The sole reported Texas case to permit a holder claim involved just such facts. *See Shirvanian,* 2004 WL 35987, 2004 Tex. App. LEXIS 182. In that case, the plaintiffs, after having expressed an intent to sell their majority stock, received numerous in-person and over-the-phone reassurances from defendants that the company was experiencing no problems, and was in fact on the verge of profit. *Id.,* 2004 WL 35987, 2004 Tex.App. LEXIS 182 at *5–*9. Both the president and chief financial officer of the company insisted that it would be unwise for plaintiffs to sell their stock, and, in reliance on their statements, the plaintiffs refrained from doing so. *Id.* Immediately thereafter, the company issued several press releases reporting that it had not met its projected earnings, and the stock price plummeted. *Id.,* 2004 WL 35987, 2004 Tex.App. LEXIS 182 at *11.

The court held that plaintiffs' "claims [were] qualitatively different than those in cases ... where the basis for the fraud claims are financial statements, annual reports, SEC filings or similar public communications. In those cases, in the absence of direct misrepresentations, plaintiffs often are not able to establish the requisite elements of their fraud claim." [26] *Id.,* 2004 WL 35987, 2004 Tex. App. LEXIS at *29. This holding is consistent with decisions in other jurisdictions that have permitted holder claims

only upon proof of direct communication. *See, e.g., New York City Employees' Ret. Sys. v. Ebbers (In re WorldCom, Inc. Sec. Litig.),* 382 F.Supp.2d 549, 559 (S.D.N.Y.2005) (holding that "there must be a sufficiently direct communication from the defendant to the plaintiff to support a claim that the fraud induced inaction"); *Gutman,* 748 F.Supp. at 266 (holding that a holder claim may proceed where "plaintiffs allege that misrepresentations were directed at them to their injury").

In line with *Shirvanian,* a federal district court sitting in Texas refused to acknowledge holder claims in which there were no "allegations of any direct or personal communication" between plaintiffs and defendants. *Newby,* 2007 WL 789141 at *14, 2007 U.S. Dist. LEXIS 17374 at *53. In *Newby,* institutional investors sued JPMorgan Chase for allegedly misrepresenting Enron's financial strength in analyst reports that were reiterated in financial news outlets, and for conspiring with Enron to produce fraudulent financial statements. *Id.* at *1, 2007 U.S. Dist. LEXIS 17374 at *4. Predicting "that [this Court] would limit, if not totally exclude, holder claims under Texas common law fraud," the court rejected the investors' claims:

---

Ct.App.2008) (noting the "great weight of authority concluding that with holder claims, the direct communication requirement is a logically necessary sub-element of justifiable reliance under New York law"); *Holmes v. Grubman,* 286 Ga. 636, 691 S.E.2d 196, 199 (2010) (requiring direct communication and observing that " '[t]he Supreme Court considered the typical fraud context to be one in which the parties knew each other and the alleged misrepresentations occurred through direct communication' " (quoting *Gutman,* 748 F.Supp. at 265)); *see also In re Parmalat Sec. Litig.,* 477 F.Supp.2d 602, 611 (S.D.N.Y. 2007) (noting that email, "a direct communi-

cation made in response to the [plaintiffs'] inquiry," showed justifiable reliance for holder claim).

**26.** The court of appeals later withdrew this opinion, substituting another holding that, because the plaintiffs' only injury was the decline in share value, the claims were derivative and could be asserted only on the corporation's behalf. *Shirvanian v. DeFrates,* 161 S.W.3d 102, 110 (Tex.App.-Houston [14th Dist.] 2004, pet. denied) (applying Delaware law). Grant Thornton does not make such a claim here, and we express no opinion on the subject.

Plaintiffs' Second Amended Complaint clearly indicates that the sources of information on which Plaintiffs relied were Enron's SEC financial statements, which JPMorgan's transactions allegedly "helped make false," and which were issued to the public at large, as well as on analyst reports, financial information services and news, all disseminated to the public at large, but not on any direct or specifically targeted contact between Plaintiffs and JPMorgan. Plaintiffs also claim they relied on "information created by Defendant and disseminated through various media outlets to Plaintiffs and other investors," again a public misrepresentation, not a direct communication. Furthermore none of these sources of information has been pleaded with specificity. Without particularity in the pleading of the misrepresentations or of actual and justifiable reliance based on direct communication, the Pandora's box of vexatious and meritless suits feared by the *Blue Chip Stamps* Court in affirming the Birnbaum rule would be realized in Texas state courts under common law fraud.

*Id.* at *13, 2007 U.S. Dist. LEXIS at *51–*52.

█ We agree with those courts that have concluded that holder claims, to the extent they are viable, must involve a direct communication between the plaintiff and the defendant. Those claims are less like holder claims and more like the "ordinary case of deceit" described by the U.S. Supreme Court. *Blue Chip Stamps*, 421 U.S. at 744, 95 S.Ct. 1917 (noting that "a misrepresentation which leads to a refusal to purchase or to sell is actionable in just the same way as a misrepresentation which leads to the consummation of a purchase or sale"). But this is not such a case.

It is undisputed that the Funds had no direct communications with Grant Thornton. Rather, the alleged misrepresentations were in publicly available documents. In fact, Deadman testified that his review of the audit reports and financial statements would have been via an online source available to any member of the public.[27] We need not decide today whether a holder claim involving more specific and direct communications is actionable under Texas law because this is not such a claim; we merely decline to permit such a claim in the absence of any direct communication. We hold, therefore, that Grant Thornton was entitled to judgment as a matter of law on the Funds' holder claims.

## IV. Conspiracy and aiding and abetting[28]

The Funds argue that, even if Grant Thornton itself did not commit fraud, it conspired with Epic in defrauding the Funds. Similarly, the Funds' aiding and abetting claim is based on Grant Thornton's alleged assistance to Epic in "making false statements . . . regarding the escrow account and the financial condition of Epic Resorts." Both claims are premised on misrepresentations, but the only misrepresentations the Funds have identified are those in the audit reports, financial statements, and negative assurance statement. Because the fraud claim based on those misrepresentations fails, the conspiracy

---

**27.** To the extent the Funds argue that the 1999 negative assurance statement was a direct representation to U.S. Trust, the Funds' representative, that claim fails for the reasons outlined above. *See* II.B.2, *supra.*

**28.** As in *Pacific Mutual,* "[b]ecause of our disposition, we do not consider whether Texas law recognizes a cause of action for 'aiding and abetting' fraud separate and apart from a conspiracy claim." *Pacific Mutual,* 51 S.W.3d at 583 n. 7.

and aiding and abetting claims dependent on that fraud fail as well. *See Pacific Mutual*, 51 S.W.3d at 583 (holding that because fraud claim against auditor failed, this "necessarily dispose[d] of [conspiracy and aiding and abetting] claims," which were "premised on [the auditor's] alleged fraud").

## V. Conclusion

Cayman was outside Grant Thornton's scope of liability as to the December 2000 bond purchase, and there is no evidence of justifiable reliance by any of the Funds as to purchases in 2001 or as to the 1999 negative assurance statement. The Funds' holder claims fail in the absence of a direct communication. No evidence supports the Funds' conspiracy and aiding and abetting claims. We reverse in part the court of appeals' judgment and render judgment that the Funds take nothing. TEX R.APP. P. 60.2(c).

Justice GUZMAN and Justice LEHRMANN did not participate in the decision.

### Appendix
### The Funds' Purchases of Epic Bonds

| Date | Purchaser | Face Amount | Purchase Price as Percent of "Par" Value | Total Purchase Price |
|---|---|---|---|---|
| 12/10/98 | Prospect | 1,000,000 | 100 | 1,000,000 |
| 08/09/99 | Prospect | 1,000,000 | 87 | 870,000 |
| 11/19/99 | Prospect | 1,000,000 | 78 | 780,000 |
| 12/15/99 | Epic makes scheduled semi-annual interest payment of $8.45 million. | | | |
| 04/14/00 | Epic's 1999 10-K (including Grant Thornton 1999 Audit Report) filed. Grant Thornton provides negative-assurance statement to Epic. | | | |
| 6/15/00 | Epic makes scheduled semi-annual interest payment of $8.45 million. | | | |
| 12/13/00 | Cayman | 410,000 | 25 | 102,500 |
| 12/15/00 | Epic makes scheduled semi-annual interest payment of $8.45 million. | | | |
| Early Q1/01 | Deadman learns that Prudential will not renew Epic's credit arrangement. | | | |
| 03/02/01 | Pam Capital | 6,000,000 | 28 | 1,680,000 |
| 03/05/01 | Pam Capital | 3,000,000 | 30.25 | 907,500 |
| 03/05/01 | Pam Capital | 3,000,000 | 30 | 900,000 |
| 03/05/01 | PAMCO | 2,000,000 | 30 | 600,000 |
| 03/13/01 | PAMCO | 10,000,000 | 26.75 | 2,675,000 |
| 03/13/01 | Cayman | 5,390,000 | 27.5 | 1,482,250 |
| 03/20/01 | Cayman | 3,430,000 | 28.125 | 964,687 |
| 03/20/01 | PAMCOV | 4,000,000 | 28.125 | 1,125,000 |
| 03/20/01 | Pam Capital | 4,000,000 | 28.125 | 1,125,000 |
| 04/17/01 | Epic's 2000 10-K (including Grant Thornton 2000 Audit Report) filed. | | | |
| 04/26/01 | Prospect | 1,000,000 | 23.5 | 235,000 |
| 04/26/01 | Cayman | 7,000,000 | 23.5 | 1,645,000 |
| 05/21/01 | Pam Capital | 4,000,000 | 23.75 | 950,000 |
| 06/15/01 | Epic does not make scheduled semi-annual interest payment. | | | |
| 06/19/01 | Pam Capital | 10,537,000 | 38.25 | 4,030,402 |

| | | | | |
|---|---|---|---|---|
| 06/20/01 | Pam Capital | 1,000,000 | 40.5 | 405,000 |
| 07/19/01 | The Funds force Epic into bankruptcy. | | | |
| 02/22/02 | The Funds sue Grant Thornton. | | | |
| 02/26/02 | Highland Crusader * | 5,000,000 | 21 | 1,050,000 |
| 04/02/02 | Highland Crusader * | 17,000,000 | 26 | 4,420,000 |
| 04/24/02 | PCMG * | 4,000,000 | 26 | 1,040,000 |
| 04/04/03 | PCMG * | 5,000,000 | 26 | 1,300,000 |

\* Highland Crusader Fund, Ltd. And PCMG Trading Partners, VII, L.P. were also funds managed by Deadman. The court of appeals affirmed summary judgment as to their claims, a decision not challenged in this Court.